NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-5586-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

TIMOTHY J. CANFIELD,

    Defendant-Appellant.

_____

> **APPROVED FOR PUBLICATION**
>
> **January 10, 2022**
>
> **APPELLATE DIVISION**

Submitted September 15, 2021 – Decided January 10, 2022

Before Judges Hoffman, Geiger and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 16-12-3619.

Joseph E. Krakora, Public Defender, attorney for appellant (Ruth E. Hunter, Designated Counsel, on the briefs).

Grace C. MacAulay, Acting Camden County Prosecutor, attorney for respondent (Jason Magid and Rachel M. Lamb, Special Deputy Attorneys General/Acting Assistant Prosecutors, of counsel and on the brief).

The opinion of the court was delivered by

SUSSWEIN, J.A.D.

Defendant appeals from his jury trial convictions for aggravated manslaughter and multiple counts of hindering apprehension or prosecution.[1] He contends that the Law Division judge committed numerous trial errors, all but one of which are raised for the first time on appeal. This case arises from a confrontation during which defendant shot his sister-in-law's former boyfriend with a compound bow and arrow, inflicting a fatal wound. Defendant claimed at trial that he meant only to release a "warning shot" and that he acted in self-defense. He testified that the victim, who defendant knew to be HIV-positive, came towards him in the course of their argument while holding an object that defendant believed to be a hypodermic syringe. The jury acquitted defendant of knowing/purposeful murder, convicting him instead of the lesser-included offense of aggravated manslaughter. In doing so, the jury necessarily found that the State had proved beyond a reasonable doubt that defendant's use of deadly force was not justified in self-defense.

Defendant contends that the trial court erred by failing to properly instruct the jury on several principles of law, by admitting expert testimony regarding the effectiveness of archery equipment, by admitting hearsay pertaining to the

---

[1] The jury also found defendant guilty of possession of a weapon for an unlawful purpose. At sentencing, the court merged that conviction into the aggravated manslaughter conviction.

State's theory that defendant's self-defense claim was fabricated, and by admitting a photograph of a hypodermic syringe that was found inside the house similar to one police found in the backyard. Defendant's contention regarding the admission of the photograph is the only asserted error that was brought to the attention of the trial judge. All of the other alleged errors are raised for the first time on appeal as plain error.

With respect to the jury instructions, defendant contends that the trial court erred by failing to instruct the jury sua sponte as to: (1) the lesser-included offense of passion/provocation manslaughter, (2) the self-defense principle that a person employing deadly force does not have a duty to retreat in his or her own dwelling, and (3) the causation of the victim's death. Defendant did not request the trial court to give any of these jury instructions.

Defendant also contends that the eighteen-year prison term imposed on the aggravated manslaughter conviction is excessive. He argues that the court misapplied aggravating and mitigating factors and should have reduced the sentence pursuant to N.J.S.A. 2C:44-1(f)(2). He further argues that a new sentencing hearing is required at which the sentencing court must retroactively apply a recently-enacted statutory mitigating factor, N.J.S.A. 2C:44-1(b)(14), that accounts for a defendant's youth.

After carefully reviewing the record in light of the arguments of the parties and governing legal principles, we reject all but one of defendant's contentions relating to trial errors. With respect to his contention that the court improperly admitted hearsay testimony regarding an alleged family plan to support a fabricated claim of self-defense, we deem it appropriate to order a limited remand for the trial court to conduct a Rule 104 hearing[2] to determine whether the elements of the co-conspirator exception to the hearsay rule have been satisfied. See infra section VIII. In all other respects, we affirm the convictions. We also affirm the sentence with the caveat that the issue whether the new youthful offender mitigating factor applies retroactively is presently pending before the Supreme Court. Because we are remanding for the trial court to make findings with respect to the co-conspirator exception to the hearsay rule, we deem it prudent for the trial court on remand to also consider whether the sentence would have been different accounting for the new statutory mitigating factor now codified in N.J.S.A. 2C:44-1(b)(14). That will obviate any need to remand the case yet again if the Supreme Court decides that the new mitigating factor applies retroactively.

---

[2] See N.J.R.E. 104.

We devote much of our attention in this opinion to defendant's argument that the trial court should have afforded the jury the option to convict him of the lesser-included offense of passion/provocation manslaughter. We conclude that the facts in evidence do not clearly indicate an objectively reasonable provocation, that is, one sufficient to arouse the passions of an ordinary person beyond the power of his or her control. We therefore hold that the trial court was not required to instruct the jury on passion/provocation manslaughter sua sponte.

In reaching this conclusion, we recognize that the trial court's decision to deliver a self-defense instruction indicates that evidence was presented at trial from which a jury might reasonably find that the victim's death was attributable to his own conduct. We reject the notion, however, that a court must instruct the jury on passion/provocation manslaughter whenever self-defense is raised in a murder prosecution. Passion/provocation manslaughter, as set forth in N.J.S.A. 2C:11-4(b)(2), is a mitigated offense that is analytically distinct from the use of force in self-protection, a justification defense, set forth in N.J.S.A. 2C:3-4.

These two statutory provisions are triggered by different material elements and prerequisites, serve different purposes, and produce markedly different results. When the State fails to disprove a claim of self-defense, the

defendant is acquitted of the charge(s) involving the use of force. When a jury finds the extenuating circumstances of passion/provocation, in contrast, a defendant is not vindicated by an acquittal; rather, a homicide that otherwise would be first-degree murder is mitigated to second-degree manslaughter.

Despite these fundamental distinctions, we recognize that both statutory provisions address—in different ways—when and how a victim's conduct may affect a defendant's culpability for causing the victim's death. We also recognize that the same circumstances that prompt a responsive use of deadly force may also provoke an impassioned reaction. When deadly force is employed during a spontaneous or swiftly-evolving confrontation, the attending circumstances may be fraught with emotion that causes the actor to lose self-control. In some murder cases, therefore, the same trial evidence that would require a court to provide a self-defense jury instruction might also require that the jury be afforded the option to convict for the lesser-included crime of passion/provocation manslaughter. After close inspection of the pertinent facts in evidence, we conclude that this case does not fall into that category. Even accepting as true defendant's version of events, as recounted in his trial testimony, he has failed on appeal to meet the "clearly-indicated" standard that is needed to require a jury instruction sua sponte. That standard is more

A-5586-18

demanding than the "rational-basis" standard that would have applied had defendant requested the trial court to deliver a passion/provocation instruction.

Our review of this case reinforces our belief that the decision as to what jury instructions should be delivered is best made in the first instance by a trial court, aided and informed by the arguments of the parties. Indeed, that is one of the fundamental purposes of the charge conference required by Rule 1:8-7(b).

We note further that self-defense often is asserted in murder trials when the identity of the alleged perpetrator is not disputed. In those cases, defense counsel will, of course, request that the jury be instructed on the legal principles concerning the authorized use of force in self-defense, and in that event, trial courts routinely deliver a self-defense charge as requested. The more challenging and nuanced question—whether passion/provocation mitigation should also be charged to the jury along with a self-defense instruction—arises often enough to warrant prophylactic measures to ensure that this fact-sensitive issue is considered in the first instance by the trial court and not, as in this case, by an appellate court after a verdict has already been rendered. We therefore recommend a new procedural rule that when, in a murder prosecution, the trial court determines to instruct the jury on self-defense at the charge conference conducted pursuant to Rule 1:8-7(b), the court should also consider and make specific findings on the record as to whether to instruct the jury on the lesser-

included offense of passion/provocation manslaughter, regardless of whether either party has requested that instruction.

A trial verdict should not be placed at risk of reversal because the parties and the court did not anticipate that this fact-sensitive issue would later be raised on appeal as plain error. Nor should an otherwise valid guilty verdict be placed in jeopardy of reversal on appeal because the defense chose for strategic reasons not to request a passion/provocation instruction, hoping for an outright acquittal rather than a second-degree manslaughter conviction.

A trial court's ultimate decision whether to instruct on passion/provocation manslaughter, of course, will depend on the specific circumstances of the case and the arguments of the parties. A defendant, for example, may argue that a passion/provocation manslaughter instruction would be incompatible with his or her self-defense theory. We emphasize that the new procedural rule we recommend would not require that a passion/provocation manslaughter instruction be given. Nor does it alter the "clearly-indicated" standard that applies when that instruction has not been requested by the defendant. The new practice we recommend is designed only to ensure that the necessity for a passion/provocation manslaughter instruction is considered at the charge conference, and that this fact-sensitive decision is made by the trial court before a verdict is rendered.

I.

We begin by summarizing the facts adduced at trial that are relevant to the issues raised on appeal. On January 28, 2013, Trisha Dulin and Vincent DeFilippis were sitting outside of the Dulin residence at an outdoor bar. Trisha[3] and DeFilippis were socializing for the first time since they had graduated from high school. At approximately 10:00 p.m., Trisha saw Kereti Paulsen—her former boyfriend and the father of her child—standing in the backyard. Paulsen and Trisha had ended their relationship just a few weeks earlier.

DeFilippis knew Paulsen from high school but had not seen him since graduating. Paulsen approached DeFilippis and a physical fight ensued, resulting in scrapes and bloody knuckles. The fight was short-lived and ended when Trisha admonished Paulsen that their relationship was over. Trisha then went inside the house with DeFilippis. Paulsen remained outside in the driveway.

Trisha informed her family that Paulsen had not left. Ashley Dulin (Trisha's sister) and defendant (Ashley's husband) came out of their bedroom. According to Ashley, her family disliked Paulsen because "he got [Trisha] into . . . drugs." Ashley further explained that Paulsen was suspected of stealing

---

[3] Because a number of the witnesses in this case share the same last name, we refer to them by their first names to avoid confusion. We intend no disrespect in doing so.

A-5586-18

from their house, and that defendant was angry at Paulsen because he "wasn't supposed to be there."

At this point, Trisha, Ashley, DeFilippis, and defendant went outside and began to argue with Paulsen. After arguing with Paulsen for several minutes, the four went back inside the house. Paulsen remained outside the residence.[4] Defendant retrieved a compound bow and arrows and went back outside to confront Paulsen.

During the one-on-one confrontation that followed, defendant shot an arrow that struck and mortally wounded Paulsen. Defendant followed Paulsen as he staggered into a neighbor's yard. The neighbor, Joseph Cassise, came out of his house to investigate the noise. Cassise asked if Paulsen, who was lying on the ground, was okay. Defendant told Cassise that he and Paulsen had "been drinking." Cassise then went back into his house.

Shortly after, defendant returned inside his house and said, "I shot an arrow. I don't know what happened." According to Ashley, defendant told her "he shot [an arrow] at the fence to scare [Paulsen]."

---

[4] We note that DeFilippis testified that defendant had a bow and arrows in his hand when the four individuals went outside. Additionally, DeFilippis testified that defendant never went back into the house with him, Ashley, and Trisha. For purposes of determining whether the trial court committed plain error, we accept defendant's version that he went inside the house with Ashley, Trisha, and DeFilippis, retrieved the bow and arrows, and then went back outside alone to confront Paulsen. See infra section III(G).

A-5586-18

Defendant testified at trial in his own defense. He claimed that he went outside armed with the bow and arrows because he "was afraid of [Paulsen]" and "didn't know what [Paulsen] was going to do." Defendant yelled at Paulsen "again and again to leave," but "he wouldn't leave." Defendant testified that Paulsen, who was approximately thirty feet away, "started coming towards me, and he pulled something out of his pocket." Defendant acknowledged that because it was dark, "I couldn't really tell what it was." He nonetheless believed that Paulsen had pulled out an HIV-infected needle because of a recent text message in which Paulsen said, "I'm HIV positive and the bitch [referring to Trisha] is gonna die anyway." Defendant testified that he assumed the object Paulsen was holding was a syringe because Paulsen had been in possession of a needle the last time police removed him from the Dulin residence.

When asked about Paulsen approaching him, defendant testified:

> I started backing up away from him, and at the point—
> I backed into—we have a ledge in front of our shed, I
> backed into that and started to lose my balance, let go
> of the bow string, and ended up shooting. I didn't want
> to hold onto the bow while I was falling down.

Defendant had told police that the bow "wasn't even fully drawn. It was just tension on the string and when I pulled back[,] I guess I tripped." Defendant testified, however, that he did not accidentally shoot the arrow at Paulsen.

Rather, defendant testified that he shot the arrow intentionally as a "warning shot" and that he intended "to scare him."

A neighbor, Bertram Francks, testified that he heard arguing and fighting outside around 10 p.m. Francks observed defendant come outside with a bow and yell at someone. He saw defendant aim the bow but did not see him back up or trip. Francks also saw defendant walk back inside the Dulin residence holding the bow and looking distraught.

Cassise also heard noise coming from the Dulins' backyard that evening. He heard someone say: "What, are you going to shoot me with that?" He then heard "some groans underneath [his] bedroom window" and "[i]t sounded like somebody was in distress." Cassise believed he heard someone say he had been shot with an arrow and subsequently had his son call 9-1-1. As previously noted, Cassise testified that he went outside and asked defendant if everything was okay. Defendant responded that everything was fine and that he and Paulsen had been drinking. Cassise then went back into his home. At or around this time, defendant called 9-1-1 using Paulsen's cellphone. He pretended to be Paulsen, telling the 9-1-1 operator, "I've been shot."

At approximately 10:50 p.m., officers from the Berlin Police Department were dispatched to the scene. Upon their arrival, the officers found Paulsen lying face down in a neighbor's yard.

Police questioned DeFilippis and Trisha at the Dulin residence and detained them in separate police vehicles after they provided conflicting statements. Trisha initially told the police that she had not seen Paulsen in weeks and did not know why the officers had been dispatched to the residence. DeFilippis also lied to the police initially, later explaining that he was concerned that they had been called because he and Paulsen had been fighting. He told police initially that his knuckles were bloody from engaging in sexual activity with Trisha. Trisha disputed that statement. Police then transported them to the police station to be interviewed.

Prior to transporting DeFilippis and Trisha to the police station, the police knocked on the door of the Dulin residence. Defendant answered and then notified Helen Dulin, the homeowner, that police wanted to search Trisha's bedroom. This was defendant's first interaction with police that night. After obtaining consent to search the bedroom, the police requested that Ashley and Helen come to the police station to provide statements. Defendant remained at the Dulin residence while the other individuals were being interviewed at the police station.

Defendant eventually went to the police station in the early morning hours of January 29, after Ashley and Helen had returned home following their interviews. While at the police station, defendant participated in two interviews.

A-5586-18

During his second interview, defendant revealed that he had lied during his first interview. Defendant testified at trial that he lied (1) about being asleep after the altercation with Paulsen, (2) that he was not outside during the altercation, (3) that he had never left the premises that night and had not followed Paulsen onto the neighbor's property, and (4) that he had not spoken to any of the neighbors. When questioned further, defendant admitted that he did speak with Cassise after the altercation and lied when he explained to Cassise that Paulsen was on the ground because he was drunk rather than because he had been shot with an arrow. Additionally, defendant admitted to police that he used Paulsen's phone to call 9-1-1 after the altercation and pretended to be Paulsen, telling the 9-1-1 operator that he was shot.

During the second interview, defendant disclosed that he had discarded the bow in a wooded area a few miles from the police station. He told police he did this because he was "scared" and "panicked." Defendant agreed to take the officers to the location where he had discarded the weapon. After police recovered the bow, they took defendant back to the Dulin residence where he re-enacted his version of events. The re-enactment was videorecorded.

A-5586-18

As previously noted, police went to the Dulin residence to search Trisha's bedroom. They found suspected drugs and an orange-capped syringe.[5] That syringe was identical to an orange-capped syringe found outside when police conducted a follow-up inspection of the crime scene.

In August 2016—more than three years after Paulsen's death—DeFilippis revealed conversations involving members of the Dulin family that allegedly occurred shortly after their police interviews had concluded on the night of the incident. DeFilippis testified:

> So, the day we got out of the police interrogation from when everything happened, that following morning, we were at the police department that night on [January] 28th, for about 9 hours. The next morning, the police had drove me and Trish back to the house in the police car, both of us. So[,] when we got to the house, Mr. [Thomas] Dulin [defendant's father-in-law] was there waiting for us. And, when we got out of the car and the cops had left everything and we got inside and settled down, there was kind of like a family meeting of everybody that was involved. And they came up with the story that we're going to say [Paulsen] had an HIV[-]positive needle, so it was self-defense instead of him just shooting an arrow at somebody he didn't like. And everybody spoke about it. And I guess they had came to kind of an agreement that that's what we're going to say, and we're going to plead self-defense on this, try to get [defendant] the least time possible for what happened.

---

[5] The record indicates that Trisha's mother consented to the search and that police also returned to the home with a search warrant. The lawfulness of the search of Trisha's room is not challenged in this appeal.

A-5586-18

15

DeFilippis further testified that a few days before he disclosed this information to police in 2016, defendant and Ashley repeatedly reached out to him to discuss the plan that had been "concocted in a living room." DeFilippis testified that when he spoke to defendant on the phone, "[i]t was kind of like stick to the story type thing." DeFilippis stated, "[a]nd[,] he kept saying, [s]tick to the story [and go] pick up my copy of the statement so I—[DeFilippis]—know exactly what was said, blah, blah, blah."

Defendant and members of the Dulin family denied that the meeting described by DeFilippis ever happened. Ashley testified that she first heard about Paulsen having a syringe at defendant's arraignment. She denied that she or defendant had advised DeFilippis to lie about what happened on the night of Paulsen's death. Thomas Dulin testified and also denied that the meeting described by DeFilippis had ever occurred. He testified that he never instructed members of his family to concoct a story about self-defense and a hypodermic syringe.

II.

In December 2016, a grand jury returned an indictment charging defendant with first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2) (count one); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count two); third-degree hindering apprehension or prosecution, N.J.S.A.

2C:29-3(b)(1), (3), and (4) (counts three, four, and five); and third-degree tampering with witnesses and informants, N.J.S.A. 2C:28-5(a)(1) (counts six and seven).

In April 2019, Judge David Ragonese presided over defendant's jury trial. After considering the evidence presented by the State and defendant, the jury acquitted defendant of knowing/purposeful murder but found him guilty of the lesser-included offense of aggravated manslaughter. The jury also found defendant guilty of third-degree possession of a weapon for an unlawful purpose (count two) and hindering apprehension or prosecution (counts three, four, and five). Defendant was acquitted on the two counts charging tampering with witnesses.

On June 10, 2019, Judge Ragonese merged the convictions for aggravated manslaughter and possession of a weapon for an unlawful purpose. He then sentenced defendant on the aggravated manslaughter conviction to an eighteen-year prison term, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The court imposed three-year prison terms on the hindering convictions and ordered them to be served concurrently with each other and the sentence imposed on the aggravated manslaughter conviction. This appeal followed.

Defendant raises the following contentions for our consideration:

POINT I

THE COURT'S FAILURE TO INSTRUCT THE JURY ON THE LESSER-INCLUDED OFFENSE OF PASSION/ PROVOCATION MANSLAUGHTER, CAUSATION, AND RETREATING FROM ONE'S OWN DWELLING, WAS PLAIN ERROR AND DEPRIVED DEFENDANT OF A FAIR TRIAL.  (Not Raised Below).

POINT II

IT WAS PLAIN ERROR TO ADMIT EXPERT TESTIMONY ON "ARCHERY EQUIPMENT EFFECTIVENESS" BECAUSE IT WOULD NOT ASSIST THE TRIER OF FACT TO UNDERSTAND THE EVIDENCE OR DETERMINE A FACT IN ISSUE, AND BECAUSE THE FIELD IS NOT GENERALLY ACCEPTED WITHIN THE SCIENTIFIC COMMUNITY.  (Not Raised Below).

POINT III

DEFILIPPIS'S TESTIMONY ABOUT A DULIN FAMILY PLAN TO CONCOCT A SELF-DEFENSE THEORY DID NOT MEET THE ELEMENTS OF THE CO-CONSPIRATOR EXCEPTION TO THE RULE AGAINST HEARSAY AND ITS ADMISSION WAS THUS PLAIN ERROR.  (Not Raised Below).

POINT IV

THE PHOTOGRAPH OF THE SYRINGE IN TRISHA'S BEDROOM WAS IMPROPERLY ADMITTED UNDER N.J.R.E. 404(b) BECAUSE IT WAS NOT INTRINSIC EVIDENCE OF THE CRIMES WITH WHICH DEFENDANT WAS CHARGED[] AND FAILED TO MEET THE COFIELD TEST FOR ADMISSIBILITY.  SEE STATE v. COFIELD, 127 N.J. 328 (1992).  IT WAS ALSO IMPROPERLY ADMITTED UNDER N.J.R.E. 403.

POINT V

THIS COURT SHOULD REMAND FOR RESENTENCING FOR THE TRIAL COURT TO RECONSIDER DEFENDANT'S SENTENCE BASED ON THE NEW MITIGATING FACTOR, "THE DEFENDANT WAS UNDER 26 YEARS OF AGE AT THE TIME OF THE COMMISSION OF THE OFFENSE." N.J.S.A. 2C:44-1(b)(14). THE TRIAL COURT ALSO ERRED IN REJECTING DEFENDANT'S REQUEST TO SENTENCE HIM A DEGREE LOWER, AND ITS FINDINGS OF AGGRAVATING AND MITIGATING FACTORS WERE NOT BASED ON COMPETENT, CREDIBLE EVIDENCE IN THE RECORD.

Defendant also contends in his reply brief that:

THE STATE'S RESPONSE TO DEFENDANT'S POINT I INCORRECTLY DEPENDS ON "AN ASSESSMENT OF THE CREDIBILITY OF THE WITNESSES." STATE v. SAMUELS, 189 N.J. 236, 251 (2007). "BUT CREDIBILITY IS NOT IN ISSUE WHEN DETERMINING IF A LESSER INCLUDED OFFENSE INSTRUCTION SHOULD BE GIVEN." IBID. RATHER, "THE QUESTION AT THAT STAGE OF THE PROCEEDINGS CENTERS ON THE EXISTENCE OF EVIDENCE TO SUPPORT THE LESSER INCLUDED OFFENSE, AND NOT ON ITS WORTH." IBID.

III.

We first address defendant's contention that the trial court committed plain error by failing to instruct the jury on the lesser-included crime of passion/provocation manslaughter sua sponte. It is not disputed that defendant

did not request this instruction at the charge conference.[6] We begin our analysis by acknowledging the foundational legal principles governing our resolution of this issue, first regarding jury instructions on lesser-included offenses generally, and then pertaining specifically to passion/provocation manslaughter.

## A.

It is a bedrock principle of our criminal justice system that "[a]ppropriate and proper charges to a jury are essential for a fair trial." State v. Carrero, 229 N.J. 118, 127 (2017) (quoting State v. Daniels, 224 N.J. 168, 180 (2016)). Proper jury instructions are "crucial to the jury's deliberations on the guilt of a criminal defendant." State v. Jordan, 147 N.J. 409, 422 (1997).

In its jury instructions, a "trial court must give 'a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.'" State v. Baum, 224 N.J.

---

[6] So far as the record shows, the lesser-included offense of passion/provocation manslaughter was not discussed at all during the charge conference. The absence of any discussion of passion/provocation manslaughter stands in contrast to the extensive discussion that took place concerning the lesser-included offenses of aggravated manslaughter and reckless manslaughter. We note that defense counsel objected to an instruction on those lesser-included offenses. Counsel argued, "[b]ut for the record, it's my request that no lesser included charges should be . . . charged here. And the reason is, Judge, I think it almost invites the jury to compromise." Cf. State v. Powell, 84 N.J. 305, 317–18 (1980) (noting "a defendant might oppose [a manslaughter] instruction for a variety of reasons, including the possibility that it provides a vehicle for a 'compromise' verdict, perhaps lessoning what he [or she] perceives to be a strong possibility of a verdict of acquittal").

147, 159 (2016) (quoting State v. Green, 86 N.J. 281, 287–88 (1981)). Accordingly, "the court has an 'independent duty . . . to ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case, irrespective of the particular language suggested by either party.'" Ibid. (alteration in original) (quoting State v. Reddish, 181 N.J. 553, 613 (2004)).

"[B]ecause correct jury charges are especially critical in guiding deliberations in criminal matters, improper instructions on material issues are presumed to constitute reversible error." State v. Jenkins, 178 N.J. 347, 361 (2004) (citing Jordan, 147 N.J. at 421–22). Therefore, an appellate court must first "determine whether the trial court erred" and, if so, must proceed to determine "if the mistake 'was clearly capable of producing an unjust result such that a reasonable doubt is raised as to whether the error led the jury to a result it otherwise might not have reached.'" Ibid. (quoting State v. Brims, 168 N.J. 297, 306 (2001)).

As our Supreme Court explained in State v. Funderburg, "[a] trial court is vested with discretion in delivering the jury instructions that are most applicable to the criminal matter before it." 225 N.J. 66, 80–81 (2016); see also State v. Ernst, 32 N.J. 567, 583–84 (1960) (citing Hargrave v. Stockloss, 127 N.J.L. 262, 266, (E. & A. 1941)) ("[A] trial judge in his [or her] discretion may give [a jury]

A-5586-18

charge in any situation in which he [or she] reasonably believes a jury may find a basis for its application."). The Court in Funderburg recognized, however, that some jury instruction decisions—such as the charging of lesser-included offenses—are governed by statute. Ibid. Specifically, N.J.S.A. 2C:1-8(e) expressly provides that a trial court "shall not charge the jury with respect to an included offense [not charged by indictment] unless there is a rational basis for a verdict convicting the defendant of the included offense." Thus, "to justify a lesser included offense instruction, a rational basis must exist in the evidence for a jury to acquit the defendant of the greater offense as well as to convict the defendant of the lesser, unindicted offense." Ibid. (citing State v. Savage, 172 N.J. 374, 396 (2002)).

One of the general principles underpinning N.J.S.A. 2C:1-8(e) is that "[n]o defendant should be convicted of a greater crime or acquitted merely because the jury was precluded from considering a lesser offense." State v. Muhammad, 182 N.J. 551, 577 (2005) (quoting State v. Garron, 177 N.J. 147, 180 (2003)). The failure to instruct the jury on a lesser-included offense can pose the risk that "[w]here one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction." State v. Sloane, 111 N.J. 293, 299 (1988) (emphasis removed) (quoting Keeble v. United States, 412 U.S. 205,

212–13 (1973)).  For that reason, trial courts must "avoid presenting the jury with an 'all-or-nothing' choice, a choice between convicting a defendant of an offense greater than the one he [or she] committed and not convicting him [or her] at all despite his [or her] guilt of a lesser offense."  State v. Maloney, 216 N.J. 91, 113 (2013) (Albin, J., dissenting) (citing Garron, 177 N.J. at 180).

The law is thus well-settled that in certain circumstances, "[a] trial judge has [] 'an independent obligation' to instruct the jury on lesser-included charges." State v. O'Carroll, 385 N.J. Super. 211, 224 (App. Div. 2006) (quoting Jenkins, 178 N.J. at 361).  As the Supreme Court made clear in Powell,

> very simply, where the facts on record would justify a conviction of a certain charge, the people of this State are entitled to have that charge rendered to the jury, and no one's strategy, or assumed (even real) advantage can take precedence over that public interest . . . .  The judge is more than a referee between contestants.  He [or she] is the law's representative, and it is his [or her] duty to see that the will of the law is done.
>
> [84 N.J. at 319.]

In Garron, the Court reaffirmed and amplified that foundational principle, stressing,

> [w]e take this occasion to remind trial courts that their primary obligation is to see that justice is done, and that a jury is instructed properly on the law and on all clearly indicated lesser-included offenses, even if at odds with the strategic considerations of counsel.  We reaffirm that the integrity of the justice system and the fact-finding process is not subordinate to the singular

A-5586-18

interests of the parties. The public interest in a correct verdict based on the evidence must trump the partisan strategic maneuvering of both the State and defendant.

[177 N.J. at 180.]

Importantly for purposes of this appeal, the substantive standard for determining whether an instruction on an included offense is required depends on whether the trial court was asked by the defendant to provide that instruction, or whether instead, as in this case, the request for the jury instruction is made by a defendant for the first time on appeal. There are two decidedly different standards: a "rational-basis" test when the request for the lesser-included offense instruction is made by a defendant at trial, and a "clearly-indicated [by the evidence]" test when a defendant contends for the first time on appeal that the trial court should have instructed the jury on a lesser-included offense sua sponte. The distinction between these two standards can be outcome-determinative and is critical to the resolution of the case before us.[7]

---

[7] We note that a footnote to the model jury charge for N.J.S.A. 2C:3-4 could be read to suggest that the test in all circumstances is whether there is a rational-basis for a passion/provocation manslaughter instruction. The footnote explains in pertinent part:

> [i]n almost all cases, if such evidence is adduced at trial, the trial court should charge purposeful murder and the lesser-included offense of aggravated manslaughter, reckless manslaughter, and passion/provocation manslaughter . . . . [I]f there is a

As the Supreme Court explained in State v. Crisantos, "the rational-basis test of the Code [under N.J.S.A. 2C:1-8(e)] imposes a low threshold" such that "[w]hen the lesser-included offense charge is requested by a defendant . . . the trial court is obligated, in view of defendant's interest, to examine the record thoroughly to determine if the rational-basis standard has been satisfied." 102 N.J. 265, 278 (1986) (first citing State v. Sinclair, 49 N.J. 525, 540 (1967); and then citing Powell, 84 N.J. at 318–19). In contrast, "[i]f parties do not request a lesser-included-offense charge, reviewing courts 'apply a higher standard,

---

> rational basis for a jury to find that defendant reasonably believed in the necessity to use force, and honestly but unreasonably believed that he/she needed to resort to deadly force to repel the danger that he/she faced, it could conclude that he/she acted in the heat of passion resulting from a reasonable provocation, which would justify submission of passion/provocation manslaughter as a lesser included offense of murder.
>
> [Model Jury Charges (Criminal), "Justification – Self Defense: In Self Protection (N.J.S.A. 2C:3-4)" (rev. June 13, 2011) (emphasis added).]

We believe the underscored portions of this footnote do not reflect the standard that applies when a defendant does not request a passion/provocation instruction at trial. As we explain, absent a defendant's request for a passion/provocation manslaughter instruction, the "clearly-indicated" test, not the "rational-basis" test, is used to determine if that instruction must be delivered.

requiring the unrequested charge to be "clearly indicated" from the record.'"[8]

State v. Fowler, 239 N.J. 171, 188 (2019) (quoting State v. Alexander, 233 N.J. 132, 143 (2018)); see also State v. Denofa, 187 N.J. 24, 42 (2006).

There are important reasons for applying a more demanding substantive standard when, as in this case, defendant raises the issue for the first time on appeal. Our Supreme Court in Funderburg emphasized that "[t]he appropriate time to object to a jury charge is 'before the jury retires to consider its verdict.'" 225 N.J. at 79. The Court added, "[w]hen a defendant fails to object to an error or omission at trial, we review for plain error. Under that standard, we disregard any alleged error 'unless it is of such a nature as to have been clearly capable of producing an unjust result.'" Ibid. (citing R. 2:10-2). The mere possibility of an unjust result is not enough. See Jordan, 147 N.J. at 422. As we have already noted, to warrant reversal of a guilty verdict, an error at trial must be sufficient

_____

[8]  We note that "[a] trial court's process for determining whether it can instruct a jury on an uncharged included offense differs depending on whether the State or the defendant has requested the charge." State v. Brent, 137 N.J. 107, 115 (1994). The Court explained that an included offense charge implicates the constitutional considerations of the notice and due process rights guaranteed in Article I, paragraph 8 of the New Jersey Constitution, which provides that "[n]o person shall be held to answer for a criminal offense unless on the presentment or indictment of a grand jury." When an included-offense charge is requested by a defendant, "the law's concern is not notice to the defendant but whether the evidence provides a rational basis for the charge[.]" Id. at 116.

to raise "a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached." Jenkins, 178 N.J. at 361 (citation omitted).

We add that while we retain the "authority to 'notice plain error not brought to the attention of the trial court[,]' provided it is 'in the interests of justice' to do so," that authority is "not intended to supplant the obvious need to . . . preserve issues for appeal." State v. [James] Robinson, 200 N.J. 1, 20 (2009) (quoting R. 2:10-2). Our case law also makes clear that a trial court need not "scour the statutes to determine if there are some uncharged offenses of which the defendant may be guilty." Brent, 137 N.J. at 118 (quoting Sloane, 111 N.J. at 302). Nor does a trial court "have the obligation on its own to meticulously sift through the entire record in every murder trial to see if some combination of facts and inferences might rationally sustain a manslaughter charge." State v. Choice, 98 N.J. 295, 299 (1985). The Court in Funderburg reaffirmed and stressed this point, "declin[ing] to impose such a burdensome requirement on trial courts or suggest that every potential lesser-included offense must be charged to the jury." 225 N.J. at 83. The Court emphasized that "[o]nly if the record clearly indicates a lesser-included charge—that is, if the evidence is jumping off the page—must the court give the required instruction." Id. at 81–82 (quoting Denofa, 187 N.J. at 42).

B.

We turn next to the legal principles that apply specifically to whether and in what circumstances the crime of passion/provocation manslaughter must be charged to the jury. A person commits murder when he or she "purposely" or "knowingly causes death or serious bodily injury resulting in death." N.J.S.A. 2C:11-3(a)(1)–(2). "[A] homicide which would otherwise be murder under N.J.S.A. 2C:11-3" may be mitigated to the lesser crime of passion/provocation manslaughter when "committed in the heat of passion resulting from a reasonable provocation." N.J.S.A. 2C:11-4(b)(2).

Passion/provocation manslaughter is a "well-established lesser-included offense of murder." Carrero, 229 N.J. at 129 (citing State v. [Alphonso] Robinson, 136 N.J. 476, 482 (1994)). The passion/provocation offense "contains all the elements of murder except that the presence of reasonable provocation, coupled with defendant's impassioned actions, establish a lesser culpability." Robinson, 136 N.J. at 482 (citation omitted). In other words, passion/provocation manslaughter "is an intentional homicide committed under extenuating circumstances that mitigate the murder." Id. at 481 (citation omitted).

A-5586-18

In Crisantos, the Court acknowledged that "passion/provocation can arise in an infinite number of factual settings." 102 N.J. at 275. In Powell, the Court noted,

> [r]easonable provocation is a legal term of art, encompassing a range of situations in which a victim behaves in such a way as to cause a reasonable man [or woman] to lose his [or her] normal self-control. The traditional categories of provocative behavior are: battery, mutual combat, assault, illegal arrest, adultery and injuries to third persons.
>
> [84 N.J. at 311 n.4 (citation omitted).]

There are four elements of passion/provocation manslaughter: (1) there must be adequate provocation; (2) "the defendant must not have had time to 'cool off' between the provocation and the slaying"; (3) "the defendant must have been actually impassioned by the provocation"; and (4) "the defendant must not have actually cooled off before the slaying." Funderburg, 225 N.J. at 80 (quoting State v. Mauricio, 117 N.J. 402, 411 (1990)).

The first two elements are objective—employing a reasonable person perspective—while the last two elements are subjective. Ibid. In determining whether the jury should be afforded the option to convict for passion/provocation manslaughter, the trial court must decide whether there is sufficient evidence of the first two elements. Importantly for purposes of this appeal, "[t]o warrant the passion/provocation jury charge, the evidence must

rationally support only the first two elements; the subjective elements 'should usually be left to the jury to determine.'" Carrero, 229 N.J. at 129 (quoting Mauricio, 117 N.J. at 413).

To satisfy the first element of attempted passion/provocation manslaughter, a jury must conclude that a reasonable person in the defendant's position would have been provoked sufficiently to "arouse the passions of an ordinary man [or woman] beyond the power of his [or her] control." State v. King, 37 N.J. 285, 301–02 (1962) (quoting State v. Herrmann, 77 N.J.L. 534, 535–36 (E. & A. 1909)).

The critical issue in this case is whether there was adequate provocation. The adequacy of provocation is measured by whether "loss of self-control is a reasonable reaction." State v. Foglia, 415 N.J. Super. 106, 126 (App. Div. 2010) (quoting Mauricio, 117 N.J. at 412). "The generally accepted rule is that words alone, no matter how offensive or insulting, do not constitute adequate provocation to reduce murder to manslaughter." Funderburg, 225 N.J. at 80 (quoting Crisantos, 102 N.J. at 274). In contrast, "battery, except for a light blow, has traditionally been considered, almost as a matter of law, to be sufficiently provocative." Robinson, 136 N.J. at 492 (quoting Mauricio, 117 N.J. at 414).

We reiterate and emphasize that under the objective standard that applies to the first two elements of passion/provocation manslaughter, the adequacy of provocation is determined by how a reasonable person would have reacted to the provocation, not by how the defendant actually reacted. The Court in Mauricio stressed:

> We emphasize that the actual reaction of the defendant is not a consideration at this point in the analysis. It is irrelevant at this stage whether the defendant in question did in fact "lose his cool." Neither the trial court in deciding whether to instruct the jury on the offense nor the jury in determining whether the offense of passion/provocation manslaughter applies should consider at this point how the defendant in fact reacted to the asserted provocation. Rather, both must limit the focus to the nature and adequacy of the provocation itself.
>
> [117 N.J. at 412.]

C.

We next consider whether and in what circumstances evidence that supports a self-defense instruction will also support a passion/provocation instruction. We begin this part of our analysis by recognizing the conceptual and practical differences between these two statutory features. Although the use of deadly force in self-protection defense may share some characteristics with passion/provocation manslaughter, these two statutory provisions are markedly

A-5586-18

different in several significant respects. Notably, one is an affirmative justification <u>defense</u>, the other a lesser-included <u>offense</u> of murder.

N.J.S.A. 2C:3-4(a) provides in pertinent part that "the use of force upon or toward another person is justifiable when the actor reasonably believes that such force is immediately necessary for the purpose of protecting himself [or herself] against the use of unlawful force by such other person on the present occasion." N.J.S.A. 2C:3-4(b)(2) places additional limits on the use of deadly force. That statute provides in pertinent part:

> (2) The use of deadly force is not justifiable . . . unless the actor reasonably believes that such force is necessary to protect himself [or herself] against death or serious bodily harm; nor is it justifiable if:
>
> (a) The actor, with the purpose of causing death or serious bodily harm, provoked the use of force against himself [or herself] in the same encounter;
>
> (b) The actor knows that he [or she] can avoid the necessity of using such force with complete safety by retreating . . . except that:
>
> (i) the actor is not obliged to retreat from his [or her] dwelling, unless he [or she] was the initial aggressor[.]
>
> [N.J.S.A. 2C:3-4(b)(2).]

A comparison of the text of N.J.S.A. 2C:3-4(a) with the text of N.J.S.A. 2C:11-4(b)(2) quickly demonstrates that the affirmative justification defense of use of force in self-protection is analytically distinct from the mitigated offense

of passion/provocation manslaughter. When the State fails to disprove a claim of self-defense, the defendant is acquitted of all manner of homicide. The deadly force that the actor employed, in other words, is found to be justified and lawful. In stark contrast, when a jury finds the extenuating circumstances of passion/provocation, the deadly force is unlawful. A conviction for the lesser-included offense of passion/provocation manslaughter is just that—a conviction for a serious crime, albeit one that is graded lower than knowing/purposeful murder. The benefit a defendant receives when passion/provocation is established, in other words, is not an outright acquittal as when the State fails to disprove self-defense; rather, a homicide that otherwise would be first-degree murder is mitigated to manslaughter—a second degree crime subject to NERA.

Aside from producing decidedly different outcomes, the material elements of these two distinct statutory provisions are not aligned. The right to use deadly force in self-defense arises only in the face of a perceived threat of death or serious bodily harm, and such force must be "immediately necessary." The immediate threat of death or serious bodily harm that justifies the responsive use of deadly force may, of course, also constitute a reasonable provocation for purposes of passion/provocation. There are other circumstances, however, that might cause a reasonable person to lose normal self-control and thus rise to the level of an adequate provocation. It is certainly possible, for example, that a

A-5586-18

33

jury might find that there was no immediate threat of death or serious bodily injury to justify the use of deadly force and yet find that the victim's conduct constituted an adequate provocation to mitigate a murder to passion/provocation manslaughter. In State v. Bonano, the Court noted in this regard,

> If the jury did not credit defendant's testimony that he believed he was in danger of being killed or seriously injured, and hence rejected the plea of self-defense, but nevertheless did believe that [the victim] made the menacing gesture[—victim drawing his knife while uttering a threat—]it might properly have considered such conduct to be adequate provocation to reduce to manslaughter what would otherwise have been murder.
>
> [59 N.J. 515, 523–24 (1971).]

### D.

Accounting for both the similarities and differences between the passion/provocation and self-defense doctrines, we next address whether and in what circumstances a passion/provocation manslaughter instruction must be given in conjunction with a self-defense instruction. In State v. Blanks, the defendant "argue[d] that a passion/provocation manslaughter charge should automatically be considered whenever a defendant claims self-defense and there is a possibility that the jury may find that the defendant overreacted to the victim's conduct." 313 N.J. Super. 55, 71 (App. Div. 1998). Although we

reversed Blanks' convictions on other grounds,[9] we did not directly address his argument that the theory of self-defense is invariably intertwined with passion/provocation manslaughter. We do so now and reject the notion that a court in a murder prosecution must instruct the jury on passion/provocation manslaughter whenever self-defense is raised. There is no authority for any such categorical rule, and we decline to adopt one.

Nonetheless, we recognize that, when applied to real-world violent encounters, the doctrines of justifiable force in self-defense and passion/provocation mitigation are not "watertight compartments." Cf. State v. Smith, 136 N.J. 245, 255 (1994) (O'Hern, J., dissenting) (remarking that "[i]n short, as our cases have repeatedly explained, the lesser-included-offense doctrine is not an abstract doctrine of watertight compartments"). Both doctrines measure a defendant's culpability for causing a death by reference to the victim's conduct. When a defendant asserts self-defense, he or she has placed the victim's conduct at issue, and the jury must apply use-of-force principles to decide whether the victim's conduct contributed to his or her own death by prompting, dare we say provoking, the justifiable use of deadly force.

---

[9] We noted in Blanks, "[w]e review this aspect of the charge [pertaining to the failure to instruct on passion/provocation manslaughter] only because other fundamental flaws in the charge require reversal and a new trial." Ibid.

As we have noted, depending on the circumstances, the justification and mitigation doctrines can overlap; the same evidence in a murder trial that supports charging the jury on the principles of self-defense may also support an instruction on the lesser-included offense of passion/provocation manslaughter. It is not uncommon, after all, that when deadly force is employed by civilians, the circumstances of the confrontation between the defendant and victim are emotionally charged and involve heated passions. As a matter of common sense, in a case where the victim's conduct posed an immediate threat of death or serious bodily harm to the defendant, the defendant's reaction to that imminent threat might be influenced as much by impassioned instinct as by a dispassionate analysis and application of use-of-force principles. Furthermore, in some cases, the immediate threat of death or serious bodily injury will be accompanied by an actual battery that has already been committed during the course of the confrontation. As our Supreme Court "noted[,] . . . 'battery, except for a light blow, has traditionally been considered, almost as a matter of law, to be sufficiently provocative.'" Robinson, 136 N.J. at 492 (quoting Mauricio, 117 N.J. at 414).[10]

---

[10] We note that in this instance, defendant does not claim that Paulsen ever stabbed or even touched him before defendant fired the fatal arrow. Rather, the evidence clearly shows that the victim was at a discrete distance—beyond the

However, the two defense theories do not always co-occur or overlap. Indeed, in some circumstances, the two theories may be mutually incompatible. In Funderburg, for example, the State "point[ed] out that a jury instruction proposing that Funderburg acted out of passion or provocation would indicate that Funderburg in fact intended to injure Parham[11]—not that Funderburg was trying to defend himself, as Funderburg's counsel argued in his closing argument." 225 N.J. at 78.[12] The State makes a similar argument in the case

---

range at which Paulsen could have immediately stabbed defendant with a syringe—when defendant unleashed deadly force.

[11] It bears noting that Funderburg involved a charge of attempted murder and thus the lesser-included offense of attempted passion/provocation manslaughter. See Robinson, 136 N.J. at 488–89 (holding that attempted passion/provocation manslaughter is a lesser-included offense of attempted murder). An attempt requires a purposeful culpable mental state, even if the completed offense, such as murder, requires only a "knowing" culpable mental state. See State v. Jones, 242 N.J. 156, 169, 174–75 (2020).

[12] Since Funderburg, our Supreme Court has noted that a defendant may be entitled to a passion/provocation charge regardless of whether that instruction would be inconsistent with the defendant's theory of self-defense, at least when the defendant requests a passion/provocation instruction. In Carrero, the trial court denied defendant's request for a passion/provocation manslaughter instruction, finding it inconsistent with defendant's own accounts of self-defense and accidental shooting. The Supreme Court concluded that the trial testimony presented a rational-basis on which the jury could acquit defendant of murder but convict him of passion/provocation manslaughter, and accordingly held that defendant's murder conviction must be reversed. The Court reasoned, "[a]lthough the passion/provocation charge is inconsistent with defendant's theories of self-defense and accidental shooting, when the evidence supports [] a [passion/provocation] charge, a defendant may be entitled to the requested

A-5586-18

37

before us, reasoning that defendant testified that he meant only to fire a "warning shot," and did not mean to strike Paulsen with the arrow.

We conclude that although the theories of justification and mitigation can overlap, they must be analyzed separately when determining whether a jury instruction on either or both theories must be delivered. Accordingly, a trial court's determination that there is an evidential basis for a self-defense jury charge does not by itself constitute a basis to charge on passion/provocation. However, we recognize that the potential for these two culpability provisions to overlap and co-occur arises on a recurring if not frequent basis. Because trial courts have an independent duty to charge on lesser offenses when the "clearly-indicated" standard is met, prudence dictates that a trial court should carefully and explicitly consider whether to afford the jury the option to convict for passion/provocation manslaughter when the court decides to instruct the jury on self-defense. We discuss our recommendation for the new procedural rule requiring such consideration in section IV.

_____

instruction regardless of whether the charge is consistent with the defense." 229 N.J. at 121 (citing <u>Brent</u>, 137 N.J. at 107).

We add that the holding in <u>Carrero</u> further underscores the significant and potentially outcome-determinative difference between the "rational-basis" and "clearly-indicated" tests. Indeed, the Court in <u>Carrero</u> stressed the difference between the two standards when it rejected the State's assertion that "<u>Funderburg</u> is controlling here." <u>Id.</u> at 127.

A-5586-18

38

E.

Although neither party relies upon or even cites to the Supreme Court's unanimous decision in Funderburg, we believe that case provides important guidance on how to apply the "clearly-indicated" standard. In Funderburg, the defendant was charged with attempting to murder his ex-partner's new boyfriend, Andrew Parham. Id. at 70. Funderburg and his former girlfriend had a child together. Ibid. On the day of the violent incident that gave rise to the case, she and Parham were at Funderburg's house to pick up the baby. Id. at 71. While Parham was putting the child in the car, Funderburg removed the keys from the ignition. Id. at 72. Parham chased Funderburg for ten to fifteen minutes in an effort to reclaim the car keys. Parham eventually stopped chasing Funderburg and knocked on the front door, hoping Funderburg's mother might convince her son to return the car keys. Ibid. Finding no one home, Parham walked back onto the street and asked Funderburg and his brother whether they wanted to fight. Ibid. They did not respond. Parham walked back to the car and leaned against it as Funderburg and his brother approached. Ibid. Parham and Funderburg continued to argue for several minutes as the confrontation continued to escalate. Ibid. At some point, Funderburg lunged at Parham and punched him several times in the chest. Ibid. When Parham stepped away, he

A-5586-18

realized he had been stabbed. Id. at 73. There was competing testimony on who had first handled the knife that caused the serious non-fatal wound. Id. at 82.

Funderburg was tried for attempted murder and aggravated assault. Id. at 70. The judge instructed the jury on a number of lesser-included offenses to aggravated assault. Ibid. However, counsel did not request a charge for the lesser-included offense of attempted passion/provocation manslaughter, and that charge was not delivered to the jury. Ibid.

On appeal, the Appellate Division panel reversed Funderburg's conviction based on the trial court's failure to deliver an instruction for attempted passion/provocation manslaughter sua sponte. Id. at 75. The Supreme Court disagreed and reinstated the defendant's attempted murder conviction, concluding that the panel had "improperly sifted through the cold appellate record and constructed a hypothetical and factually unsupported scenario in which Funderburg might have conceivably been adequately provoked." Id. at 70. The Court concluded that the facts before the trial court:

> did not clearly indicate that the objective elements of attempted passion/provocation manslaughter were present. In particular, there was insufficient evidence before the jury that a reasonable person in Funderburg's position would have been adequately provoked by Parham's behavior. Parham's chase did not threaten Funderburg; it was simply an attempt to retrieve the car keys. The chase was preceded by verbal sparring, at which point Funderburg refused to return the keys. Thus, this interaction alone did not suggest adequate

A-5586-18

provocation. Beyond that, there was insufficient evidence to suggest that Parham had wielded the knife. At best, there was a disagreement among the witnesses about who first handled the knife that later stabbed Parham. Andrews and Parham both testified that Funderburg was the first person to reveal a knife. Only Funderburg's father Leroy testified that Parham revealed the knife first.

Even if the jury found Leroy's testimony to be the most credible of all the eyewitnesses, Leroy's statement that Parham initially held the knife would at most support the theory that Funderburg acted in self-defense; it would likely not support a theory that Funderburg was actually impassioned and intended to kill Parham. Ultimately, there was insufficient evidence in the trial record to indicate that a reasonable person in Funderburg's situation would have been adequately provoked.

[Id. at 82 (citation omitted).]

The Court's analysis confirms that the two standards are different in practical application, not just abstract theory. The "clearly-indicated" standard that must be met to reverse a conviction for failure to deliver a jury instruction sua sponte is more demanding than the "rational-basis" standard that applies when a defendant asks a trial court to instruct the jury on passion/provocation manslaughter.

The Court's subsequent decision in Carrero reaffirms that the choice of standards is critical to the analysis and can be outcome-determinative. In that case, the Court distinguished Funderburg, explaining, "[c]entral to the

distinction is the lack of request for the jury instruction in Funderburg and the clear request for the jury instruction here." 229 N.J. at 127. The Court in Carrero stressed, "[h]ere, we apply a different standard—the rational-basis test—to review the trial court's failure to provide a jury instruction when defendant requested it." Id. at 127–28.

We therefore read Funderburg to establish a clear principle that must be applied by appellate courts: when a defendant asks for a passion/provocation instruction for the first time on appeal—only after the defense trial strategy has failed—the requisite provocation must be more than "hypothetical." Funderburg, 225 N.J. at 70. The evidence clearly indicating a reasonable provocation must "jump[] off the page." Id. at 81–82 (citing Denofa, 187 N.J. at 42).

F.

We next consider the State's argument that defendant invited the error he now raises on appeal, in which event we could refuse to consider defendant's contention rather than apply a plain error standard of review. The State cites to State v. Williams for the general proposition that "[t]he doctrine of invited error does not permit a defendant to pursue a strategy . . . and then when the strategy does not work out as planned, cry foul and win a new trial." 219 N.J. 89, 101 (1984). The State argues that the error defendant now claims on appeal was

invited because defense counsel at the charge conference not only failed to request a passion/provocation charge but also affirmatively objected to charging the jury on the lesser-included offenses of aggravated manslaughter and reckless manslaughter.

Although there was no mention of passion/provocation manslaughter at the charge conference, counsel, when objecting to jury charges on aggravated manslaughter and reckless manslaughter, argued that "no lesser included charges should be charged here." See supra note 6 (emphasis added). This is clearly a situation where the defense would have preferred that the jury be presented with an "all-or-nothing" choice. The issue now before us is whether the invited error doctrine applies in these circumstances. We conclude it does not.

The Supreme Court's analysis and holding in Jenkins provides instruction. 178 N.J. at 347. In that murder case, defense counsel at the charge conference acknowledged that the facts supported an instruction on the lesser offense of reckless manslaughter but advised that his client had requested that the court refrain from charging the jury on lesser-included offenses. Id. at 359–60. The prosecutor also acknowledged that a conviction for aggravated manslaughter or reckless manslaughter could be returned on the evidence presented and reminded the trial court of its independent duty to make that determination irrespective of

A-5586-18

the defendant's position.  The trial court decided not to instruct the jury on the lesser-included charges.  Id. at 360.

On appeal, the defendant "reversed positions."  Id. at 357.  He argued that "notwithstanding his request at trial, the court erred in failing to instruct on [the] lesser-included offenses of reckless manslaughter and aggravated manslaughter."  Ibid.

Before addressing the substantive merits of the defendant's appellate contention, the Supreme Court considered whether any error had been "invited."  The Court carefully framed the issue, noting, "we focus on whether a defendant invites error merely by advocating an erroneous approach or, instead, whether the court actually must rely on the defendant's position in reaching a result."  Id. at 358.  The Court recognized that as a general matter, a "defendant cannot beseech and request the trial court to take a certain course of action, and upon adoption by the court, take his [or her] chance on the outcome of the trial, and if unfavorable, then condemn the very procedure he [or she] sought and urged, claiming it to be error and prejudicial."  Ibid. (quoting State v. Pontery, 19 N.J. 457, 471 (1955)).  The Court added,

> when a defendant asks the court to take his [or her] proffered approach and the court does so, we have held that relief will not be forthcoming on a claim of error by that defendant.  On another occasion, we characterized invited error as error that defense counsel has "induced."  State v. Corsaro, 107 N.J. 339, 346

(1987). However, we have not decided whether actual reliance by the court is necessary to trigger the doctrine.

[Ibid.]

The Court then explained that the doctrine of invited error as applied in criminal cases "is designed to prevent defendants from manipulating the system." Id. at 359. As a result, the Court reasoned,

> the invited-error doctrine . . . is implicated only when a defendant in some way has led the court into error. Conversely, when there is no evidence that the court in any way relied on a defendant's position, it cannot be said that a defendant has manipulated the system. Some measure of reliance by the court is necessary for the invited-error doctrine to come into play.
>
> [Ibid. (citation omitted)].

Applying those general principles to the matter before it, the Court in Jenkins determined that although the trial court had acceded to the defendant's request, the trial court's explanation for its decision made clear that it had arrived at the decision not to instruct on lesser-included offenses "independently of any invitation or encouragement by defendant." Id. at 360. The Supreme Court concluded that "the doctrine of invited error does not apply. However, because defendant did not object to the lack of such an instruction, we will review the decision not to instruct on lesser-included offenses under a plain-error standard." Ibid. Ultimately, the Court affirmed the Appellate Division's conclusion that

the failure to deliver the lesser-included charges constituted plain error.  Id. at 369.

The matter before us is distinguishable from Jenkins in several respects. Here, there was no explicit request by defendant that the trial court not charge the jury on passion/provocation manslaughter—the specific charge that defendant now argues should have been delivered sua sponte.  We decline to assume that defendant's generic argument not to charge on lesser-included offenses—which was made in the context of a discussion regarding the lesser-included offenses of aggravated manslaughter and reckless manslaughter— somehow influenced the trial court's decision whether to charge on passion-provocation manslaughter.  The trial court in this case could not have relied on defendant's generic "all-or-nothing" position in deciding whether to charge the jury on passion/provocation manslaughter for the simple reason that no "decision" was made with respect to that specific instruction.  As we have noted, the passion/provocation mitigation doctrine was not even mentioned, much less argued and ruled upon, at the charge conference.  We thus conclude that the trial court did not "actually . . . rely on the defendant's position in reaching a result." Id. at 358.

In Blanks, we addressed the invited error doctrine in the specific context of a passion/provocation manslaughter jury instruction.  313 N.J. Super. at 55.

A-5586-18

In that case, the defendant contended on appeal that that the trial judge's failure to deliver a passion/provocation manslaughter charge denied him a fair trial. Id. at 71. Defendant "acknowledge[d] that he did not request this charge. In fact, his attorney agreed that the trial judge should not deliver this charge." Ibid. We remarked,

> [w]e would be remiss if we did not express our concern about the invited error which seems to have occurred in this matter. Ordinarily, we would refuse to review this error because defense counsel expressly agreed that a passion/provocation instruction should not be given. We review this aspect of the charge only because other fundamental flaws in the charge require reversal and a new trial.
>
> [Ibid.]

Blanks is distinguishable from the matter before us because in that case, defense counsel affirmatively and specifically agreed that the passion/provocation manslaughter instruction should not be delivered to the jury. Here, in contrast, defendant did not expressly argue against a passion/provocation instruction. His silence with respect to any such instruction is at best a tacit objection that must be extrapolated inferentially from his objection to other lesser-included-offense charges. In these circumstances, we decline to invoke the invited error doctrine to the extent that the doctrine might allow us to refuse to consider the merits of defendant's newly minted contention applying a plain error standard of review. We are satisfied that the plain error

standard, especially when viewed through the lens of the robust "clearly-indicated" test, adequately accounts for defendant's apparent strategic preference for an "all-or-nothing" choice and his failure to broach the specific issue of whether to instruct the jury on passion/provocation manslaughter. We reject defendant's contention not because he invited the error he now complains of but rather because we are convinced that no error was committed in failing to deliver a passion/provocation instruction based on the evidence that was adduced at trial.

We do not mean to suggest, however, that the invited error doctrine would not apply if, for example, a defendant at trial were to argue successfully that a passion/provocation manslaughter instruction would be incompatible with the defendant's self-defense theory, see infra note 19, and later "reversed positions" by claiming that the trial court erred by accepting the defendant's trial argument. See Jenkins, 178 N.J. at 357. In those circumstances, applying the analysis spelled out in Jenkins, the invited error rule would indeed apply if the trial court were to rely on the defendant's argument in deciding not to instruct the jury on passion/provocation manslaughter. Id. at 359. But that simply did not happen in this case.

A-5586-18

## G.

Before we can apply the trial evidence to the "clearly-indicated" test to decide whether there was an objectively reasonable provocation, we first must consider how we determine what the relevant facts are since the circumstances of the confrontation were disputed at trial. The method by which we identify the evidence to measure against the "clearly-indicated" yardstick is an important component of the standard of appellate review we must apply when a defendant claims for the first time on appeal that the trial court failed to deliver a jury charge sua sponte. By definition, in cases where there was no request for a passion/provocation manslaughter charge and the issue was not discussed at the charge conference, the trial court will not have had occasion to make findings on the record that a reviewing court might rely upon—and defer to—in applying the "clearly-indicated" test. In those circumstances, it falls upon the reviewing court to determine what evidence to consider in determining whether the need for a sua sponte charge on passion/provocation manslaughter was clearly indicated in the record.

In this instance, defendant asserts in his reply brief that "the State is essentially arguing that defendant's testimony regarding being provoked and impassioned is not credible." Defendant contends the State's response violates the rule established in State v. Samuels, 189 N.J. 236 (2007). We do not agree

with that characterization of the State's argument on appeal. We do agree, however, that when determining whether the "clearly-indicated" test has been met, a court should not be concerned with the credibility of the evidence that might support a jury instruction on a lesser-included-offense. The State argued at trial that defendant's self-defense claim was fabricated. It was for the jury— not a trial or appellate court—to decide whether defendant's self-defense testimony was credible. Accordingly, in determining whether the trial evidence clearly indicates adequate provocation, we have disregarded the evidence presented by the State that defendant's self-defense claim was fabricated after the slaying. See infra subsection H. Rather, for purposes of determining whether the trial court was obliged to instruct the jury on passion/provocation manslaughter, we accept defendant's testimony as credible and thus base our decision on his version of the events that unfolded.

That approach is consonant with the rationale in Samuels, upon which defendant relies. The Court in Samuels addressed whether the trial court committed plain error by failing to charge attempted robbery as a lesser-included offense of armed robbery. Id. at 243. The prosecutor in that case "counter[ed] [the defendant's] contention with the State's version of the facts." Id. at 251. The Supreme Court noted,

> The problem with the Attorney General's response is
> that it depends on an assessment of the credibility of the

A-5586-18

witnesses. But credibility is not in issue when determining if a lesser included offense instruction should be given. The question at that stage of the proceedings centers on the existence of evidence to support the lesser included offense, and not on its worth.

[Id. at 251–52 (citations omitted).]

We note that in Carrero, the Court used a different formulation to explain how trial evidence is to be assessed in determining whether a passion/provocation manslaughter instruction was required. In that case, the Court explained, "[i]n deciding whether the rational-basis test has been satisfied, the trial court must view the evidence in the light most favorable to the defendant." 229 N.J. at 128 (citing Mauricio, 117 N.J. at 412) (emphasis added). We now consider whether the "most-favorable-to-the-defendant" formulation should also be used when the "clearly-indicated" test applies.[13]

In Mauricio, the Court used broader language than it would later use in Carrero, explaining, "[w]hen deciding whether to instruct a jury on passion/provocation manslaughter, a trial court should view the situation in the

---

[13] We note that defendant in his reply brief—which focuses solely on the State's response to the passion/provocation manslaughter jury charge issue—does not ask us to apply the most-favorable-to-the-defendant standard in determining whether the evidence clearly indicates the basis for charging that lesser included offense. Indeed, defendant does not mention the most-favorable-to-the-defendant standard of review; rather, defendant relies on the rule announced in Samuels that "credibility is not in issue when determining if a lesser included offense instruction should be given." 189 N.J. at 251.

light most favorable to the defendant." 117 N.J. at 412 (emphasis added). The Court in Mauricio thus did not explicitly limit the most-favorable-to-the-defendant standard to situations where the issue was "whether the rational-basis test has been satisfied" as was true in Carrero. However, in Mauricio, the defendant "contend[ed] that the trial court incorrectly refused to instruct the jury on passion/provocation manslaughter." Id. at 410. It is thus clear that the provocation/manslaughter jury charge issue was not raised for the first time on appeal as plain error. Accordingly, the Court in Mauricio had no occasion to decide whether the most-favorable-to-the-defendant standard should apply to cases where the defendant claimed that the trial court failed to instruct on passion/provocation manslaughter sua sponte, that is, cases where the heightened "clearly-indicated" standard applies.

We add that the broader language in Mauricio explaining when to use the most-favorable-to-the-defendant lens was directed specifically and explicitly at trial courts. See id. at 410 ("a trial court should view the situation in the light most favorable to the defendant.") (emphasis added). That suggests this standard is meant to be used when the question whether to instruct a jury on passion/provocation manslaughter has been addressed at the trial court level, not when that issue is raised for the first time on appeal as plain error.

We also take note that in Carrero, the most-favorable-to-the-defendant language appeared at the end of the same paragraph that began with a recognition that "[t]he rational-basis test sets a low threshold." 229 N.J. at 128; (citing Crisantos, 102 N.J. at 278). The Court in Carrero took pains to differentiate between the "rational-basis" and "clearly-indicated" tests in rejecting the State's assertion that "Funderburg is controlling here." Id. at 127. Specifically, the Court emphasized:

> Despite the similarity in factual circumstances—a violent interaction preceded by a tense relationship between two men involved in a romantic triangle—Funderburg does not direct the outcome here. Central to the distinction is the lack of request for the jury instruction in Funderburg and the clear request for the jury instruction here. We decided Funderburg under a "clearly indicated" standard of review because it involved an alleged failure to provide a sua sponte instruction—the trial court had the obligation to give the instruction if the evidence "clearly indicated" the objective elements of the offense. Ibid. Here, we apply a different standard—the rational-basis test—to review the trial court's failure to provide a jury instruction when defendant requested it.
>
> [Id. at 127–28].

It also bears noting that in Funderburg, the Court rejected the defendant's plain error argument notwithstanding that conflicting evidence had been presented on whether the defendant or the victim had first wielded the knife. 225 N.J. at 82 (remarking, "[b]eyond that, there was insufficient evidence to

suggest that [the victim] had wielded the knife. At best, there was a disagreement among the witnesses about who first handled the knife that later stabbed [the victim]."). That conclusion is inconsistent with the application of a most-favorable-to-the-defendant standard. More fundamentally, the jump-off-the-page review emphasized in Funderburg is at odds with the notion that the trial evidence should be viewed in the light most favorable to the defendant.

It thus appears that the most-favorable-to-the-defendant standard is reserved for cases where a defendant affirmatively requests a trial court to instruct on passion/provocation manslaughter, and does not apply when, as in this case, the issue is raised as plain error. That interpretation of the case law would suggest yet another substantive difference between the "low threshold" rational-basis test, Carrero, 229 N.J. at 128, and the more rigorous clearly-indicated test.

We recognize that from a practical perspective, there may not be a significant difference between the most-favorable-to-the-defendant formulation and the formulation employed in Samuels—a plain error case—which instructs appellate courts to consider only the existence of evidence to support a passion/provocation charge and not the worth of that evidence. 189 N.J. at 251–52. In the matter before us, we are satisfied that under either standard the

evidential basis for a passion/provocation instruction is not clearly indicated in the trial record for reasons we explain in detail in the next subsection.

## H.

With the foregoing guiding principles in mind, we proceed next to apply the "clearly-indicated" test to the evidence that was presented at trial. The critical issue before us focuses on the first element of the passion/provocation manslaughter offense, that is, whether there was objectively reasonable provocation sufficient to arouse the passions of an ordinary person beyond the power of his or her control. See Carrero, 229 N.J. at 129.

We conclude there was not. We reach that conclusion without having to meticulously sift through the trial record in search of facts bearing on whether there had been a reasonable provocation. Cf. Funderburg, 225 N.J. at 82–83 (citing Choice, 98 N.J. at 299). Defendant testified at trial in his own defense. In this instance, defendant's testimony establishes that Paulsen's conduct did not constitute an objectively reasonable provocation to mitigate murder.[14]

---

[14] Although the absence of a request for a passion/provocation jury instruction effectively deprived the judge an opportunity to rule on passion/provocation mitigation during the course of the trial, we note that at sentencing, the judge commented, "defendant was the one who created the circumstances that led to the victim's death. He was the one who chose to leave his home when he could have called the police. He was the one who brought a weapon outside." The judge added, "If there was any provocation to this crime, it was defendant who created it." The judge also remarked, "[d]efendant was the one who initiated the

The flaw in defendant's plain error contention, therefore, is not that the evidence relevant to passion/provocation is buried in the trial record, making it unduly burdensome for the trial court on its own to have gleaned a basis for delivering a passion/provocation manslaughter charge. See ibid. Rather, defendant's plain error argument fails because the version of events he recounted in his trial testimony does not "jump off the page" in establishing that there was objectively reasonable provocation. Ibid. Even accepting the credibility of defendant's testimony, see supra subsection G, his version of the events that unfolded during the fatal confrontation fails to meet the "clearly-indicated" standard as to have required a jury instruction on passion/provocation manslaughter sua sponte.

Indeed, what jumps off the pages of the trial transcript is the absence of evidence relating to many of the traditional attributes of objectively reasonable provocation. Notably, for example, there was no evidence of physical fighting involving defendant and Paulsen. Rather, there were just words between them. See Crisantos, 102 N.J. at 274 (noting words alone do not constitute adequate provocation).

---

encounter . . . . There is no evidence that tends to excuse or justify defendant's conduct."

In Robinson, testimony was presented that "[the victim], a boxer, punched defendant once extremely hard on the nose and mouth, and defendant 'buckled' and 'staggered back.'" 136 N.J. at 479. The Court concluded that "in view of [the victim's] admittedly powerful blow to defendant's face, we agree that the facts clearly indicate the objective adequacy of the provocation." Id. at 492.

In the matter before us, in contrast, there is no evidence of any such physical battery. Defendant was not involved in or even present at the brief fistfight between Paulsen and DeFilippis. Accordingly, the subsequent one-on-one encounter between defendant and Paulsen does not fall under the rubric of either the "battery" or "mutual combat" variants of reasonable provocation. See Powell, 84 N.J. at 311 n.4 (recognizing battery and mutual combat as two of the "traditional categories of provocative behavior").

But even if the fatal confrontation between defendant and Paulsen were charitably characterized as a mutual combat "contest," it certainly was not waged on equal terms. See State v. Viera, 346 N.J. Super. 198, 215–16 (App. Div. 2001) (citing Crisantos, 102 N.J. at 274–75) (noting that "although mutual combat under certain circumstances may constitute adequate provocation and reduce murder to manslaughter, the contest must be waged on equal terms"). Paulsen was, at most, armed with a syringe that might be impressed into use as a close-range weapon. Defendant, in contrast, had taken the precaution to arm

A-5586-18

himself with a compound bow that was designed to be a deadly weapon, one that could—and did—kill at distance.

Defendant's decision to retrieve a deadly weapon shows that he was primed for a violent confrontation. The trial evidence suggests, moreover, that defendant displayed the weapon, as indicated by the statement attributed to Paulsen, "What, are you going to shoot me with that?" Defendant testified that his "original intent was to show [Paulsen] I had a weapon." Defendant, in other words, made a show of force, presumably to intimidate Paulsen and to induce him to leave. Indeed, defendant testified that he meant to scare Paulsen. In these circumstances, it seems fair to say that defendant essentially became the provocateur of the fatal violence that ensued. See supra note 14 (explaining that the trial judge reached the same conclusion during the sentencing hearing).

We acknowledge that defendant's testimony, when viewed in context with DeFilippis' testimony concerning past episodes involving Paulsen, could be interpreted to suggest that Paulsen may have previously threatened to infect others with HIV.[15] But what jumps off the page of the trial transcript is that

---

[15] We agree that past conduct and prior interactions between the parties may be considered in gauging the adequacy of provocation. See Viera, 346 N.J. at 266 (holding a course of conduct, including a prior confrontation between the defendant and victim, may be considered as part of the totality of the circumstances in determining whether there was adequate provocation); see also Funderburg, 225 N.J. at 70–71 (recounting incidents of hostility between the

defendant never testified that on this occasion, Paulsen explicitly threatened to use a syringe as a weapon. Indeed, defendant never testified that Paulsen had ever assaulted anyone with a syringe or had ever explicitly threatened to do so. Nor was there any evidence to suggest that Paulsen had used or threatened to use a syringe or any other type of weapon during the earlier fight with DeFilippis. Rather, defendant subjectively assumed the threat from the fact that Paulsen was approaching him and appeared to have pulled out some object that defendant assumed was a hypodermic syringe.

By defendant's own account, moreover, the victim was thirty feet away when he began to approach defendant. Defendant did not testify that Paulsen was running at him. Rather, defendant testified only that Paulsen was "coming towards" him. Defendant did not testify that Paulsen had come close enough to have used a syringe as a weapon. Furthermore, defendant did not testify that Paulsen was holding the object in his hand as if preparing to strike with it. There was, in other words, no evidence of a "menacing gesture." Bonano, 59 N.J. at 523–24.

Throughout the confrontation, defendant was yelling at Paulsen. That circumstance certainly indicates that defendant was agitated. However, the first

_____

defendant and victim that occurred weeks before the altercation that resulted in the victim's stabbing).

A-5586-18

element of passion/provocation manslaughter focuses on the victim's conduct claimed to be provocative, not on whether defendant's passions were actually aroused. See Mauricio, 117 N.J. at 412.

We note, finally, that defendant contends there was evidence that he was "scared" and had "panicked." That argument once again misses the point. At the risk of undue repetition, we reiterate that the critical threshold question before us is not whether defendant subjectively lost his capacity for self-control. Rather, this case hinges on whether the victim's conduct would cause an objectively reasonable person to lose control.

In any event, our own review of the pertinent trial testimony shows that the officer who interviewed defendant and testified that he had panicked was not referring to defendant's decision to use deadly force during the confrontation. Rather, the trial testimony concerning "panic" relates to defendant's subsequent decisions to lie to an inquiring neighbor about Paulsen's dire physical condition and thereafter to discard the bow and arrows at a remote, unconnected location.

For purposes of determining whether a passion/provocation manslaughter instruction is clearly-indicated, it is irrelevant that defendant may have lost his capacity for self-control after he realized that he had mortally wounded Paulsen. Defendant's decision to lie to the neighbor about Paulsen's condition and his ensuing decision to abandon the crime-weapon in the woods may well show that

A-5586-18

he was, by that point, in a state of panic. But those passions and any resultant loss of self-control are attributable to defendant's alarming conduct, not Paulsen's.

In view of our conclusion that there was insufficient evidence of adequate provocation, we need not decide whether there had been an adequate "cooling off" period. See Funderburg, 225 N.J. at 83 ("Without sufficient evidence to suggest adequate provocation, there is no need to consider whether a reasonable person in Funderburg's position would have had time to cool off between the provocation and [attempted] slaying."). We note that in Robinson, the Court acknowledged, "it is well-nigh impossible to set specific guidelines in temporal terms" when determining whether defendant had sufficient time to cool down between the provocation and the defendant's reaction. 136 N.J. at 492 (quoting Mauricio, 117 N.J. at 413). The Court nonetheless held that "a half hour [is] not, as a matter of law, a sufficiently long period of time such that 'no jury could rationally determine that a reasonable person's inflamed passions might not have cooled sufficiently to permit the return of self-control.'" Id. at 492 (quoting Mauricio, 117 N.J. at 415).

In this instance, defendant testified that his one-on-one confrontation with Paulsen "was all of a matter of a few seconds." It would thus appear that there was no time at all for any inflamed passions to cool as measured from the

A-5586-18

moment of the provocation that defendant now asserts—the victim coming towards him while holding a presumed syringe—and the moment defendant fired the arrow.[16]  But as <u>Funderburg</u> suggests, a consideration of the adequacy of a "cooling off" period is unnecessary.  Indeed, that analysis seems inapposite in the absence of an objectively reasonable provocation from which to cool down from.

In sum, applying the "clearly-indicated" test to the evidence adduced at trial, we conclude that defendant was not entitled to an instruction on passion/provocation manslaughter sua sponte.

IV.

The passion/provocation jury charge issue defendant raises on appeal as plain error arises often enough to warrant a new practice and procedure to safeguard a defendant's right to a fair trial and to avoid whenever possible the need to reverse an otherwise valid jury verdict.[17]  As our Supreme Court stressed

---

[16]  At the sentencing proceeding, the trial judge rejected defendant's request to apply mitigating factor four, N.J.S.A. 2C:44-1(b)(4) ("[t]here were substantial grounds tending to excuse or justify the defendant's conduct, though failing to establish a defense"), reasoning that "[d]efendant was the one who initiated this encounter.  He had ample time to consider an alternative."

[17]  As we noted at the outset of this opinion, courts in this State are not infrequently tasked in murder cases to decide whether to instruct the jury on the lesser-included offense of passion/provocation manslaughter.  <u>See, e.g.</u>, <u>Carrero</u>, 229 N.J. at 131 (facts were sufficient for passion/provocation charge);

in <u>Funderburg</u>, "[t]he appropriate time to object to a jury charge is 'before the jury retires to consider its verdict.'" 225 N.J. at 79 (citing <u>R.</u> 1:7-2). It follows that trial judges, not appellate courts, should decide in the first instance what jury instructions should be delivered. In making those decisions, moreover, trial courts should be aided and informed by the arguments of the parties. Indeed, that is one of the principal reasons for the Court Rule that requires the trial court to hold a charge conference. <u>R.</u> 1:8-7(b) ("Prior to closing arguments, the court shall hold a charge conference on the record in all criminal cases."). Trial courts should not be dissuaded from considering whether to instruct on passion/provocation mitigation by what the Court in <u>Garron</u> characterized as

<u>Funderburg</u>, 225 N.J. at 82 (defendant was not entitled to passion/provocation jury charge); <u>State v. Branch</u>, 155 N.J. 317, 329 (1998) (counsel failed to request passion/provocation jury charge); <u>Robinson</u>, 136 N.J. at 492 (evidence was sufficient for sua sponte jury charge on attempted passion/provocation manslaughter); <u>State v. Purnell</u>, 126 N.J. 518, 540–42 (1992) (record did not indicate need for passion/provocation jury charge); <u>State v. Oglesby</u>, 122 N.J. 522, 535–36 (1991) (record did not support passion/provocation jury charge); <u>State v. Perry</u>, 124 N.J. 128, 158–59 (1991) (facts did not clearly indicate appropriateness of jury charges); <u>Mauricio</u>, 117 N.J. at 417–18 (defendant was entitled to passion/provocation charge); <u>Crisantos</u>, 102 N.J. at 278 n.11 (trial court did not err in failing to provide jury charge on passion/provocation); <u>Powell</u>, 84 N.J. at 310; <u>Viera</u>, 346 N.J. Super. at 214 (defendant was entitled to sua sponte passion/provocation jury charge); <u>Pridgen</u>, 245 N.J. Super. at 250 (charge on passion provocation was required). We list only published cases where the failure to charge on passion/provocation was raised on appeal. We do not list unpublished cases that have addressed this recurring issue. <u>See</u> <u>R.</u> 1:36-3 (stating that except in circumstances not relevant here, "no unpublished opinion shall be cited by any court.")

"partisan strategic maneuvering of both the State and defendant[,]" 177 N.J. at 180, which in this case may have been expressed by the parties' silence.

History shows that counsel in murder cases often determine that their client's interests would best be served by an "all-or-nothing" verdict. See Powell, 84 N.J. at 317–18 (recognizing that a defendant "might oppose [a lesser included manslaughter] instruction for a variety of reasons" including the possibility of "perhaps lessening what he [or she] perceives to be a strong possibility of a verdict of acquittal"). Indeed, both parties may prefer to take their chances on an all-or-nothing verdict, in which event they may choose not to raise the passion/provocation manslaughter issue with the trial judge. But as we have emphasized, trial courts have an independent obligation to determine whether the jury should be given the option to convict on lesser charges. See Jenkins, 178 N.J. at 361 (holding that even in the absence of a request-to-charge, "a trial court has an independent obligation to instruct on lesser-included charges when the facts adduced at trial clearly indicate that a jury could convict on the lesser while acquitting on the greater offense"); see also Powell, 84 N.J. at 317 (noting that "[a]lthough a manslaughter instruction is usually requested by a defendant . . . it is conceivable that the State could be the party seeking such an instruction, or the [trial] court could consider delivery of such an instruction on its own where neither party has made a request therefor").

One of the problems with what might be characterized as a "don't ask/don't charge" litigation strategy is that it puts the onus entirely on the trial judge to broach the issue. Furthermore, the parties' strategic silence deprives the judge the benefit of helpful arguments in marshaling the relevant facts to determine whether the issue warrants a fulsome discussion. Cf. Powell, 84 N.J. at 311–12 (noting, "[t]he situation was complicated further when the courts were forced to look to the record themselves (without any request by counsel) for circumstances that could provide the inference of provocation/passion where an altercation had taken place."). It is time to bring the decision whether to instruct on passion/provocation manslaughter out of the shadows and onto the record in cases where the trial court has already determined that the jury must consider whether the victim's conduct affects the defendant's culpability under the self-defense doctrine.

The recurring nature of the provocation/manslaughter jury instruction issue that was raised in this case for the first time on appeal prompts us to recommend a new procedural rule designed to enhance the decision-making process at the trial court level so that courts can better fulfill their independent obligation to charge a jury on passion/provocation when that instruction is required to be delivered. We also deem it appropriate to take steps to minimize the chances that an otherwise valid guilty verdict might have to be reversed for

A-5586-18

plain error. Any such reversal and the resultant need to retry a murder case exacts a toll not only on the parties and the courts, but also on the survivors of the homicide; victims have a keen interest in the fairness and finality of a trial verdict. At the risk of stating the obvious, we have an obligation to help ensure that error is not committed with respect to a passion/provocation jury instruction, not just to remedy plain error on appeal by vacating a conviction and remanding for a new trial.[18]

---

[18] We note that if a retrial were needed in any case, such as the present one, where the defendant had been acquitted of murder but convicted of aggravated manslaughter, the defendant could be retried only for aggravated manslaughter and lesser offenses, not murder. That circumstance would complicate the jury instructions on retrial to the extent that the passion/provocation manslaughter offense requires the jury to find that the State proved the elements of knowing/purposeful murder. In State v. Grunow, the Court held that passion/provocation manslaughter could be presented at a retrial despite the initial conviction for aggravated manslaughter. 102 N.J. 133, 149 (1986). The Court nonetheless acknowledged,

> [w]e recognize that our holding on the availability of passion/provocation to mitigate aggravated manslaughter will raise practical problems in presenting the issues to the jury on the retrial since the defendant cannot be retried for murder. We believe, however, that if the evidence presented at the retrial warrants, the court can clarify that passion/provocation manslaughter may be an available verdict if the jury finds from the evidence that the State has proven the elements of that offense beyond a reasonable doubt.
>
> [Ibid.; see also Pridgen, 245 N.J. Super. at 251.]

We therefore deem it prudent that when in a murder prosecution the trial court determines to instruct the jury on self-defense, the court at the charge conference conducted pursuant to Rule 1:8-7(b) should also consider and make specific findings on the record on whether to instruct the jury on the lesser-included offense of passion/provocation manslaughter, regardless of whether that instruction was requested by either party. To that end, we recommend that the Model Criminal Jury Charges Committee consider the advisability of revising the model jury instructions for murder, aggravated manslaughter, reckless manslaughter, passion/provocation manslaughter, and self-defense to include a notation or footnote advising trial judges to consider whether to deliver the passion/provocation instruction in cases where the judge has determined to deliver a self-defense instruction.

We emphasize that our recommendation is designed to ensure that the decision whether to instruct the jury on passion/provocation manslaughter in addition to self-defense is made with the aid of the arguments of counsel[19] and

_____

We cite these cases to underscore that the best way to avoid the "practical problems" alluded to in Grunow is to avoid the need for a retrial by ensuring that the passion/provocation manslaughter issue is addressed correctly in the first instance by the trial court.

[19] A defendant's argument, for example, that a passion/provocation manslaughter instruction would be inconsistent with his or her self-defense theory should be presented to the trial court for its consideration. That argument

placed on the record to facilitate appellate review if that should become necessary. We stress that a passion/provocation instruction will not always be needed or appropriate in conjunction with a self-defense instruction. A trial court's ultimate decision of whether to instruct on passion/provocation manslaughter will depend on a careful analysis of the specific circumstances of the case and the arguments of the parties. We also wish to make clear that we do not mean to alter the "clearly-indicated" standard that applies when the defendant has not requested the passion/provocation manslaughter charge or objects to it. See Funderburg, 225 N.J. at 81 ("When the parties to a criminal proceeding do not request that a lesser-included offense such as attempted passion/provocation manslaughter be charged, the charge should be delivered to the jury only when there is 'obvious record support for such [a] charge.'") (citation omitted); see also supra note 8 (discussing when the request for the instruction is made by the State). Accordingly, a trial court should apply the "clearly-indicated" standard if, at the charge conference, the defendant objects to a passion/provocation manslaughter instruction. The new practice we recommend is designed only to ensure that the applicable standard—whichever

should not be broached for the first time on appeal by the prosecutor, as was necessary in Funderburg, 225 N.J. at 78; see also supra note 12.

that may be—is applied in the first instance by the trial court before a verdict is rendered, rather than by an appellate court reviewing a cold record.

V.

We next address defendant's contention that the trial court erred in instructing the jury on the legal principles of self-defense. Defendant contends that the charge on self-defense was incomplete and inadequate because the court instructed the jury that a person has a duty to retreat before employing deadly force but did not instruct the jury that a person is not obliged to retreat from his or her own dwelling unless he or she was the aggressor. Defendant did not request that specific instruction at the charge conference. Nor did he object to the use-of-force charge that was delivered.[20]

Because this issue was not raised at the charge conference, the judge had no occasion to make specific findings with respect to the proximity of the fatal confrontation to the house in which defendant resided. Defendant contends on appeal that, "[f]rom this record,[21] there was sufficient evidence that Paulsen was shot on defendant's driveway, close to the shed, and that the driveway was part

---

[20] The record shows that Judge Ragonese delivered thorough and accurate instructions on the principles of self-defense, tracking the pertinent model jury charges as agreed at the charge conference.

[21] Defendant refers to the videotaped re-enactment that he performed for police, and to his trial testimony recounting his version of events.

A-5586-18

69

of the home's curtilage." We accept, for purposes of argument, that the incident occurred on or near defendant's driveway. Notably, defendant does not claim on appeal that the fatal confrontation occurred on a porch or entranceway of a structure that was used as a home or lodging. Rather, the fundament of his argument on appeal is that the driveway is part of the home's "curtilage" and thus is included within the rubric of a dwelling for purposes of the duty to retreat. We reject defendant's legal argument and, accepting his version of the facts, conclude that the fatal confrontation between defendant and Paulsen occurred outside the geographic scope of defendant's "dwelling" as that term is used in N.J.S.A. 2C:3-4(b)(2)(b)(i).

A.

As we have already explained, when there is no objection to the jury charge, the standard of review on appeal is plain error. Funderburg, 225 N.J. at 79; R. 2:10-2. "[P]lain error requires demonstration of 'legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'" State v. Chapland, 187 N.J. 275, 289 (2006) (quoting State v. Hock, 54 N.J. 526, 538 (1969)). As our Supreme Court recently reaffirmed in State v. Montalvo, when a defendant does not object to the jury charge, "there is a

presumption that the charge was not error and was unlikely to prejudice . . . defendant's case." 229 N.J. 300, 320 (2017) (quoting State v. Singleton, 211 N.J. 157, 181–82 (2012)). When determining whether the plain error standard has been met, moreover, the charge must be read as a whole, and the error "must be evaluated in light of the totality of the circumstances—including all the instructions to the jury, [and] the arguments of counsel." State v. Adams, 194 N.J. 186, 207 (2008) (alteration in original) (quoting State v. Marshall, 123 N.J. 1, 145 (1991)).

Under New Jersey law, the use of deadly force is not justifiable in self-defense if the "actor knows that he can avoid the necessity of using such force with complete safety by retreating" except that the "actor is not obliged to retreat from his [or her] dwelling, unless he [or she] was the initial aggressor." N.J.S.A. 2C:3-4(b)(2)(b)(i). We are tasked in this appeal to determine (1) the meaning of the statutory phrase "from his [or her] dwelling," and (2) whether the confrontation between defendant and Paulsen occurred within or appurtenant to a dwelling as to require that the jury be instructed on this exception to the general duty to retreat before employing deadly force.

The term "dwelling" is not defined in N.J.S.A. 2C:3-4(b)(2)(b)(i) nor in any other subsection or paragraph of N.J.S.A. 2C:3-4. However, it bears noting that the term also is used in N.J.S.A. 2C:3-4(c), which addresses the duty to

A-5586-18

retreat from a threat posed by an intruder.[22]  We believe the term dwelling is intended to have same meaning in both N.J.S.A. 2C:3-4(b)(2)(b)(i) and N.J.S.A. 2C:3-4(c).  These two statutory provisions appear in the same section of Title 2C that explains when force may be used in self-protection.  The two provisions are, without question, closely related; both pertain to the circumstances when persons are authorized to stand their ground while in their dwellings.  See DiProspero v. Penn, 183 N.J. 477, 492 (2005) (first citing Lane v. Holderman, 23 N.J. 304, 313 (1957); and then citing Chasin v. Montclair State Univ, 159 N.J. 418, 426–27 (1999)) ("We ascribe to the statutory words their ordinary meaning and significance, and read them in the context with related provisions so as to give sense to the legislation as a whole."); see also State v. Rolon, 199 N.J. 575, 589 (2009) (Long, J., concurring) (citing Oldfield v. N.J. Realty Co., 1 N.J. 63, 69 (1948)) ("[W]here the Legislature uses the same language more

---

[22]  N.J.S.A. 2C:3-4(c)(1) provides:

> Notwithstanding the provisions of N.J.S. 2C:3-5, N.J.S. 2C:3-9, or this section [N.J.S.A. 2C:3-4], the use of deadly force upon or toward an intruder who is unlawfully in a dwelling is justifiable when the actor reasonably believes that the force is immediately necessary for the purpose of protecting himself [or herself] or other persons in the dwelling against the use of unlawful force by the intruder on the present occasion.

than once in a statute, the same meaning will be ascribed to each usage unless the Legislature has specifically indicated otherwise."). Accordingly, published cases that explain the scope of the use-of-force-against-an-intruder provision, N.J.S.A. 2C:3-4(c), are relevant and persuasive in explaining the scope of N.J.S.A. 2C:3-4(b)(2)(b)(i).

B.

We begin our survey of the relevant precedents by highlighting the model jury instruction for N.J.S.A. 2C:3-4(c), which provides helpful guidance as to the meaning of the term "dwelling."[23] See State v. Whitaker, 402 N.J. Super. 495, 513–14 (App. Div. 2008) (citing State v. Angoy, 329 N.J. Super. 79, 84 (App. Div. 2000)) (acknowledging that trial courts may rely on model jury charges and that following a model charge "is a persuasive argument in favor the charge as delivered"). That model charge explains that a "dwelling" is "any building or structure though movable or temporary, or a portion thereof, which is used as a person's home or place of lodging." Model Jury Charges (Criminal), "Justification – Use of Force Upon an Intruder (N.J.S.A. 2C:3-4(c))" (rev. Sept.

---

[23] We note that the model jury charge for N.J.S.A. 2C:3-4(b)(2)(b)(i) provides consistent but less detailed guidance on the meaning of the term "dwelling." That model instruction provides simply: "[**CHARGE WHERE APPLICABLE**: A dwelling includes a porch or other similar structure.]" Model Jury Charges (Criminal), "Justification – Self Defense: In Self Protection (N.J.S.A. 2C:3-4)" (rev. June 13, 2011) (emphasis in original).

12, 2016). The model charge for N.J.S.A. 2C:3-4(c) further explains that "dwelling includes the entranceway of a building or structure" and also "includes a 'porch or similar appurtenance.'" Ibid. The model jury charge cites as authority our decisions in State v. Martinez, 229 N.J. Super. 593 (App. Div. 1989) and State v. Bilek, 308 N.J. Super. 1 (App. Div. 1998).

In Martinez, we held that for purposes of N.J.S.A. 2C:3-4(c), the term "dwelling" includes the threshold of the house, such as the porch or front door. 229 N.J. Super. at 604. In Bilek, we held that a "dwelling" includes the doorway or entranceway of an apartment. 308 N.J. Super. at 12. So far as we are aware, no judicial decision has interpreted either N.J.S.A. 2C:3-4(c) or N.J.S.A. 2C:3-4(b)(2)(b)(i) to apply to an altercation that occurs entirely outdoors at a location that is not on or at the entranceway to a structure.

## C.

Defendant urges us to interpret the word dwelling more expansively to encompass any part of the so-called "curtilage" of a house. Curtilage is a Fourth Amendment concept that defines the geographic scope of the heightened privacy protections that are associated with a home. Those constitutional privacy protections may in certain circumstances be extended outside a house to walkways, driveways, and porches. See State v. Domicz, 188 N.J. 285, 302 (2006) (emphasis added) (citing State v. Johnson, 171 N.J. 192, 208–09 (2002))

("Curtilage is land adjacent to a home and <u>may</u> include walkways, driveways, and porches.").

We decline defendant's invitation to rely on Fourth Amendment principles to expand the scope of the term dwelling for purposes of authorizing deadly force pursuant to N.J.S.A. 2C:3-4(b)(2)(b)(i).  The Fourth Amendment and its state constitutional counterpart—Article I, paragraph 7 of the New Jersey Constitution—serve a different purpose than the statutory framework that explains when a person is justified in using deadly force.  The Fourth Amendment and Article I, paragraph 7, protect against liberty and privacy incursions by the government in the form of arrests, searches, and seizures. These constitutional provisions do not protect against intrusions by private actors.  <u>See</u> <u>State v. Navarro</u>, 310 N.J. Super. 104 (App. Div. 1998) (holding that the Fourth Amendment applies only to government actions and not to unreasonable searches conducted by a landlady).  Ultimately, the scope of the dwelling exception to the general duty to retreat before employing deadly force is defined by statute, not by Fourth Amendment principles.

We find support for our conclusion that N.J.S.A. 2C:3-4(b)(2)(b)(i) does not extend throughout the curtilage of a home in <u>Bonano</u>, 59 N.J. at 515.  That pre-code case interpreted and applied the duty-to-retreat principles that are now

codified in N.J.S.A. 2C:3-4(b)(2)(b)(i) and N.J.S.A. 2C:3-4(c).[24]  In Bonano, the Supreme Court examined the so-called "castle doctrine," which is the common law exception to the general rule that a person must retreat when it is reasonably safe to do so before using deadly force for self-protection or the protection of others.  The Court in Bonano relied on our State's predecessor general self-defense statute, N.J.S.A. 2A:113-6, and on common law principles exempting the general duty to retreat when using protective force in one's own home.  The Court quoted our then-recent observation in State v. Provoid, 110 N.J. Super. 547, 554 (App. Div. 1970), that "the majority of jurisdictions in this country have concluded the privilege of self-defense without retreat extends to anywhere within the 'curtilage' of a man's [or woman's] home."  59 N.J. at 520.

The Bonano Court remarked, "[t]his is, indeed, the majority view, and yet one may question its soundness."  Ibid.  The Court went on to stress that "'[c]urtilage' is not a term that can in all cases be precisely defined," and then posed the rhetorical question, "[m]ight not the better rule be that a duty to retreat should exist except as to the dwelling house itself, defined, as stated above, to include a porch or other similar appurtenance?"  Ibid.  The Court concluded,

---

[24] N.J.S.A. 2C:3-4(a) and (b) were enacted in 1978 as part of the original version of the New Jersey Code of Criminal Justice (penal code), N.J.S.A. 2C:1-1 to 104-9 (L. 1978, c. 95).  N.J.S.A. 2C:3-4(c) was enacted in 1987.  L. 1987, c. 120, § 1.

"[t]his case does not raise the issue and we leave its resolution to another day." Ibid. The Court nonetheless made clear, "[a]t this time, however, we limit our acceptance of this [castle] rule to those cases <u>where the defendant is actually in his dwelling house</u>. A porch or other similar physical appurtenance is deemed to come within this concept." <u>Ibid.</u> (emphasis added).

We share the <u>Bonano</u> Court's concern that the term "curtilage" is not well-defined. Grafting the amorphous and potentially complex[25] curtilage concept into the definition of the term dwelling for purposes of N.J.S.A. 2C:3-4(b)(2)(b)(i), therefore, might introduce uncertainty and ambiguity to the penal code. For example, if we accepted the broad interpretation of dwelling that defendant proposes, would the exception to the general duty to retreat apply to

_____

[25] In <u>Domicz</u>, our Supreme Court noted:

> Whether the Fourth Amendment safeguards an area of curtilage depends on a consideration of various factors, including whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by. An area within the curtilage to which the public is welcome, such as a walkway leading to an entrance to a home, is not afforded Fourth Amendment protection because the resident has given implicit consent to visitors to approach the home that way.
>
> [188 N.J. at 302 (citations and quotations omitted).]

the entire length of a driveway, extending to the apron that abuts a public sidewalk or street? Would it extend to the entire area of a back or side yard, reaching to and terminating at the unmarked boundary of a neighbor's yard? Or is there an invisible line on a driveway or backyard—fixed somewhere between the point closest to the house and the outer boundaries of the property line—where the circumstances in which deadly force is authorized abruptly changes? We leave that type of line-drawing to the Legislature and decline to interpret this use-of-force provision of the penal code in a way that might render it impermissibly vague. Cf. State v. Dillihay, 127 N.J. 42, 52 (1992) (quoting State v. Profaci, 56 N.J. 346, 350 (1970)) (noting that "[e]ven though a statute may be open to a construction which would render it unconstitutional or permit its unconstitutional application, it is the duty of this Court to so construe the statute as to render it constitutional if it is reasonably susceptible to such interpretation"). It is one thing for trial and appellate courts to determine the amorphous boundaries of a home's curtilage when deciding motions to suppress evidence. It is another thing to import that complex and subjective legal construct into the penal code as an element of an affirmative defense that must be explained to a jury.

The Legislature presumably was aware of the concerns raised in Bonano when it enacted N.J.S.A. 2C:3-4(b)(2)(b)(i) in 1978 and N.J.S.A. 2C:3-4(c) in

1987.  See <u>DiProspero</u>, 183 N.J. at 494.  Notably, the Legislature did not employ the term curtilage in the penal code.   Rather, the Legislature enacted a formulation in N.J.S.A. 2C:3-4 aligned with the more narrowly-crafted holding in <u>Bonano</u>.  See <u>id.</u> at 294–95 ("The Legislature knows how to incorporate into a new statute a standard articulated in a prior [judicial] opinion.").

We add that N.J.S.A. 2C:1-1(e) expressly provides that, "[t]he provisions of the [penal] code not inconsistent with those of prior laws shall be construed as a continuation of such laws."   Applying that principle of statutory construction, we interpret the geographic scope of the term dwelling in N.J.S.A. 2C:3-4(b)(2)(b)(i) to have the same meaning as was used in the common law duty-to-retreat principles and predecessor use-of-force statute, N.J.S.A. 2A:113-6, that were interpreted in <u>Bonano</u>.

We are thus satisfied that <u>Martinez</u> and <u>Bilek</u> were correctly decided and we see no reason to part company with the thoughtful analysis in those cases. Nor has the Legislature seen fit to overturn those decisions by expanding the term dwelling to include outdoor areas such as a backyard or driveway.  In <u>DiProspero</u>, our Supreme Court recognized that "the Legislature is presumed to be aware of judicial construction of its enactments."  183 N.J. at 494 (quoting <u>N.J. Democratic Party, Inc. v. Samson</u>, 175 N.J. 178, 195 n.6 (2002)). Relatedly, "the Legislature knows how to incorporate into a new statute a standard

A-5586-18

articulated in a prior [judicial] opinion." Id. at 494–95; see also State v. Thomas, 166 N.J. 560, 567–68 (2001) (citing State v. Wilhalme, 206 N.J. Super. 359, 362 (App. Div. 1985), superseded by statute, N.J.S.A. 2C:43-7.2(d), as recognized in Rutgers Cas. Ins. Co. v. LaCroix, 194 N.J. 515, 532 (2008)) ("Under applicable canons of statutory construction, when the Legislature uses words in a statute that previously have been the subject of judicial construction, the Legislature will be deemed to have used those words in the sense that has been ascribed to them.").

D.

We next apply the Bonano/Martinez/Bilek interpretation of "dwelling" to the facts adduced at trial. The trial evidence, including defendant's version of events as related in his trial testimony, clearly shows that he did not shoot the arrow at Paulsen while either of them was on or in a porch, front door, or entryway. Rather, as we have noted, defendant on appeal claims that Paulsen was shot on the driveway, close to the shed. In these circumstances, we do not believe the confrontation between them occurred within or appurtenant to defendant's dwelling for purposes of N.J.S.A. 2C:3-4(b)(2)(b)(i). Given that conclusion, we need not address whether defendant was the "initial aggressor" for purposes of applying N.J.S.A. 2C:3-4(b)(2)(b)(i) (the "actor is not obliged to retreat from his [or her] dwelling, unless he [or she] was the initial

aggressor").[26]  Accordingly, the trial court did not err, much less commit plain error, by failing to instruct the jury on this inapposite use-of-force principle sua sponte.

## VI.

We turn next to defendant's contention that the trial court delivered incomplete and inadequate instructions to the jury on the principles of causation as set forth in N.J.S.A. 2C:2-3.  That statute reads in its entirety:

> a. Conduct is the cause of a result when:
>
> (1) It is an antecedent but for which the result in question would not have occurred; and
>
> (2) The relationship between the conduct and result satisfies any additional causal requirements imposed by the code or by the law defining the offense.
>
> b. When the offense requires that the defendant purposely or knowingly cause a particular result, the actual result must be within the design or contemplation, as the case may be, of the actor, or, if not, the actual result must involve the same kind of injury or harm as that designed or contemplated and not be too remote, accidental in its occurrence, or dependent on another's volitional act to have a just bearing on the actor's liability or on the gravity of his offense.
>
> c. When the offense requires that the defendant recklessly or criminally negligently cause a particular

---

[26] We note in the interest of completeness that Judge Ragonese remarked at sentencing that "[d]efendant was the one who initiated the encounter" and that "[i]f there was any provocation to this crime, it was defendant who created it."

result, the actual result must be within the risk of which the actor is aware or, in the case of criminal negligence, of which he should be aware, or, if not, the actual result must involve the same kind of injury or harm as the probable result and must not be too remote, accidental in its occurrence, or dependent on another's volitional act to have a just bearing on the actor's liability or on the gravity of his offense.

d. A defendant shall not be relieved of responsibility for causing a result if the only difference between what actually occurred and what was designed, contemplated or risked is that a different person or property was injured or affected or that a less serious or less extensive injury or harm occurred.

e. When causing a particular result is a material element of an offense for which absolute liability is imposed by law, the element is not established unless the actual result is a probable consequence of the actor's conduct.

Judge Ragonese charged the jury with respect to each homicide offense that the State had to prove beyond a reasonable doubt to show defendant caused Paulsen's death. The judge instructed the jury that "[y]ou must find that Kereti Paulsen would not have died but for defendant's conduct." The judge also instructed the jury that, "[w]hether the killing is committed purposely or knowingly, causing death or serious bodily injury resulting in death must be within the design or contemplation of the defendant."

Defendant contends that these instructions on causation were insufficient and that the trial judge committed plain error by failing to deliver what defendant

A-5586-18

characterizes as the "full" jury charge on causation sua sponte.[27] Defendant does not dispute that he did not request the trial court to deliver that model jury

---

[27] Defendant refers to the model jury charge on causation that reads, in pertinent part:

> Causation has a special meaning under the law. To establish causation, the State must prove two elements, each beyond a reasonable doubt:
>
> First, but for the defendant's conduct, the result in question would not have happened. In other words, without defendant's actions the result would not have occurred.
>
> **[WHEN PURPOSEFUL OR KNOWING CONDUCT INVOLVED]**
>
> Second, the actual result must have been within the design or contemplation of the defendant. If not, it must involve the same kind of injury or harm as that designed or contemplated, and must also not be too remote, too accidental in its occurrence or too dependent on another's volitional act to have a just bearing on the defendant's liability or on the gravity of his/her offense.
>
> **[WHEN RECKLESS OR NEGLIGENT CONDUCT INVOLVED]**
>
> Second, [for reckless conduct] that the actual result must have been within the risk of which the defendant was aware. If not, it must involve the same kind of injury or harm as the probable result and must also not be too remote, too accidental in its occurrence or too dependent on another's volitional act to have a just

A-5586-18

charge. Nor does he dispute that he did not object to the causation instructions that were delivered.

## A.

We begin our analysis by acknowledging that the "full" causation jury instruction is not required in all cases. We note in this regard that the model jury charge for murder provides judges with two distinct options for charging on causation: one consisting of a single sentence to be used "if causal relationship between conduct and result is not an issue,"[28] and a longer option,

---

> bearing on the defendant's liability or on the gravity of his/her offense.
>
> Second, [for negligent conduct] that the actual result must have been within the risk of which the defendant should have been aware. If not, it must involve the same kind of injury or harm as the probable result and must also not be too remote, too accidental in its occurrence or too dependent on another's volitional act to have a just bearing on the defendant's liability or on the gravity of his/her offense.
>
> [Model Jury Charges (Criminal), "Causation (N.J.S.A. 2C:2-3)" (approved June 10, 2013) (emphasis in original).]

[28] The first causation option in the model jury charge for murder reads: "Whether the killing is committed purposely or knowingly, causing death or serious bodily injury resulting in death must be within the design or contemplation of the defendant." As noted, the trial judge read this option verbatim to the jury.

reproducing the relevant text of N.J.S.A. 2C:2-3, "if causal relationship between conduct and result is an issue." Model Jury Charge (Criminal), "Murder (N.J.S.A. 2C:11-3(a)(1) and 3(a)(2))" (rev. June 14, 2004) (emphasis in original); see supra note 27 (reproducing the long version of the model causation instruction). In this instance, Judge Ragonese read verbatim the language in the model murder charge that applies when the causal relationship between conduct and result is not at issue.[29] Cf. Whitaker, 402 N.J. Super. at 513–14 (quoting Angoy, 329 N.J. Super. at 84) (explaining that "[w]hen a jury instruction follows the model jury charge, although not determinative, 'it is a persuasive argument in favor of the charge as delivered'").

The notion that a jury instruction on legal causation is not required when causation is not raised as an issue at trial is consistent with comments to the Model Penal Code provision after which N.J.S.A. 2C:2-3 is modelled. The

---

[29] We also note that Judge Ragonese properly charged the jury as to reckless manslaughter and aggravated manslaughter. In doing so, Judge Ragonese read verbatim the language in the model jury charges for when the causal relationship between the conduct and result is not an issue. See Model Jury Charges (Criminal), "Reckless Manslaughter (N.J.S.A. 2C:11-4(b)(1)" (rev. Mar. 22, 2004) (emphasis in original) ("**If causal relationship between conduct and result is not an issue, charge the following:** You must find that **(insert victim's name)** would not have died but for defendant's conduct."); Model Jury Charges (Criminal), "Aggravated Manslaughter (N.J.S.A. 2C:11-4(a))" (rev. Mar. 22, 2004) (emphasis in original) ("**If causal relationship between conduct and result is <u>not</u> an issue, charge the following:** You must find that (insert victim's name) would not have died but for defendant's conduct.").

drafters of the Model Penal Code noted that the causation provision "treats but-for causation as the causal relationship that is normally sufficient, viewing this as the simple, pervasive meaning of causation in the penal law."  Model Penal Code and Commentaries § 2.03 cmt. 2 at 257–58 (Am. L. Inst. 1985).  The 1971 commentary to N.J.S.A. 2C:2-3 recites almost identical language, noting that the statute "treats but-for cause as the causality relationship that normally should be regarded as sufficient, in the view that this is the simple, pervasive meaning of causation that is relevant for purposes of penal law."  N.J.S.A. 2C:2-3 cmt. 3 (1971).

## B.

The critical threshold question before us is whether the cause of Paulsen's death was contested at trial and thus genuinely at issue.  Defendant emphasizes on appeal that N.J.S.A. 2C:2-3 and the model jury charge on causation refer to a "result . . .  not [] too remote, too accidental in its occurrence or too dependent on another's volitional act to have a just bearing on the defendant's liability or on the gravity of his/her offense."  (emphasis supplied by defendant).  Defendant now argues that his testimony that he "lost his balance and ended up shooting" supports a finding by the jury that he fired the arrow accidentally, thereby automatically putting causation at issue.

A-5586-18

We disagree. For one thing, defendant's newly minted argument on appeal ignores that he expressly and unambiguously testified at trial that he did not shoot the arrow accidently, but rather did so intentionally as a warning shot. Furthermore, defendant's argument conflates the fact-sensitive issue of whether and to what degree he acted culpably in firing the arrow with the analytically distinct question of whether his actions caused Paulsen's death. Defendant's testimony concerning the awkward manner in which he claims to have discharged the bow clearly supports the notion that his actions were reckless and that he did not purposely or knowingly kill Paulsen.[30] Indeed, the jury ultimately acquitted defendant of knowing/purposeful murder but found him guilty of the lesser-included offense of aggravated manslaughter, which requires a reckless culpable mental state. N.J.S.A. 2C:11-4(a)(1). But even accepting defendant's version as true, any miscue in aiming the weapon did not affect the chain of causation between the release of the arrow and the mortal wound that resulted from that criminal act. Defendant's argument misconstrues the plain text of N.J.S.A. 2C:2-3 by ignoring that the phrase "not too . . . accidental in its

---

[30] As we have noted, Judge Ragonese instructed the jury on the lesser-included offenses of aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1), and reckless manslaughter, N.J.S.A. 2C:11-4(b)(1). Both of these lesser-included offenses require a reckless culpable mental state in contrast to the knowing or purposeful mental culpability states required for the crime of murder for which defendant was indicted. Defendant on appeal does not argue that the jury was improperly instructed as to the meaning of "reckless" conduct.

A-5586-18

occurrence" refers to the "actual result," not to the voluntary act element of the offense. See N.J.S.A. 2C:2-1(a) (providing in pertinent part that "[a] person is not guilty of an offense unless his [or her] liability is based on conduct which includes a voluntary act or the omission to perform an act of which he [or she] is physically capable").

When causation is genuinely at issue, the specific causation requirement prescribed in N.J.S.A. 2C:2-3 must be interpreted in the context of the culpable mental state required for the offense. As the plain text of N.J.S.A. 2C:2-3 makes clear, the standard for legal causation in cases where the offense requires that the defendant purposely or knowingly caused a particular result is different from the legal causation standard that applies when the offense requires that the defendant recklessly or negligently caused a particular result. The fact that the culpable mental state applies to all of the material elements of the offense, including the result element,[31] does not mean, however, that causation is automatically at issue when a defendant acts recklessly or negligently. As the commentators to the Model Penal Code noted, "the Code proceeds on the assumption that issues of this sort ought to be dealt with as problems of the culpability required for conviction and not as problems of 'causation.'" Model

---

[31] See N.J.S.A. 2C:2-2(a) and N.J.S.A. 2C:2-2(c)(1), providing that the culpable mental state applies to all the material elements of the offense, including the conduct (voluntary act or omission) and the result of the conduct.

Penal Code § 2.03 cmt. 2 at 258 (Am. L. Inst. 1985). Accordingly, we interpret the statutory phrase "not too . . . accidental in its occurrence" to address whether the actual result of a defendant's conduct is fortuitous, not whether the defendant acted purposefully, knowingly, recklessly, or negligently in using deadly force.

## C.

We need not repeat in this section the case law we have already discussed that explains the contours of the plain error standard of review that applies when a defendant challenges jury instructions for the first time on appeal. We now add to that discussion analyses of three cases in which guilty verdicts were reversed on appeal as plain error specifically because the trial courts failed to deliver adequate jury instructions on causation. We do so to shed light on when the relationship between a defendant's conduct and the resultant harm of that conduct is deemed to be at issue.[32]

In State v. Green, the defendant was charged with aggravated assault of a police officer. 318 N.J. Super. 361, 365–66 (App. Div. 1999), aff'd o.b., 163 N.J. 140 (2000). The officer, who was in plain clothes but was wearing a jacket marked "police," approached the defendant's vehicle, displayed his badge, and told the defendant he would like to speak with him. Id. at 367–68. Green reacted

---

[32] We note that defendant fails to cite to cases discussing causation in his appeals brief.

by putting the car in reverse, "peel[ing] backward quickly," and then driving forward.  Id. at 368.  The officer ran after the car while shouting for Green to stop.  Ibid.  The fleeing vehicle struck the pursuing officer in the leg, causing him to experience some pain.  Ibid.  The officer continued to run alongside defendant's car and "punched his right hand through the driver's side window, shattering the window and cutting his hand."  Ibid.  The officer was taken to the hospital and eventually was left with a scar on his palm.  Ibid.  The seriousness of the hand injury was relevant to whether the defendant had committed aggravated assault as distinct from simple assault.

On those facts, we determined that "there was a factual issue regarding causation [of the hand injury] that required the trial judge to give a fact-specific causation charge, and that her failure to do so was plain error."  Id. at 373.  Specifically, in that case, the jury needed to resolve whether the defendant's actions were the legal cause of the officer's hand injury in view of the officer's volitional decision to punch the car window during his pursuit.  Id. at 374–75.

In State v. Parkhill, the defendant was convicted at trial of second-degree reckless vehicular homicide, N.J.S.A. 2C:11-5(a).  461 N.J. Super. 494 (App. Div. 2019).  The defendant was travelling 80 m.p.h. in a 45 m.p.h. zone and had been tailgating a vehicle when he crossed an intersection and struck and killed a pedestrian.  Id. at 497.  The victim tried to traverse the road outside the

crosswalk, while defendant and other oncoming drivers had a green light.  Ibid. The defendant contended that the victim caused the accident by crossing a busy road during the morning rush hour against the light and outside the cross-walk. Id. at 498.  Defendant argued on appeal that in these circumstances, the trial court should have delivered a specific instruction on causation sua sponte, which the model jury charge on vehicular homicide requires "[i]f proximate cause is an issue."  Id. at 498–99; see Model Jury Charges (Criminal), "Vehicular Homicide (N.J.S.A. 2C:11-5)" (rev. Apr. 20, 2020), n. 2.  The trial court delivered the model charge on vehicular homicide, but not the causation charge. Id. at 498.

We recognized that not every case will present a genuine issue of causation.  Id. at 501.  We acknowledged, however, that the jury must be given the option to find causation, "assuming there is evidence raising an issue as to remoteness, fortuity, or another's volitional act."  Id. at 504.  We held that the failure to charge on causation was plain error, noting that the defendant had expressly placed causation in issue.  Id. at 500.

In State v. Martin, our Supreme Court also found plain error in the trial court's failure to instruct the jury on causation.  119 N.J. 2, 15 (1990).  In that case, the defendant was charged with murder, felony murder, arson, and aggravated arson arising out of the death of a woman in a building that defendant

set on fire.  <u>Id.</u> at 5.  The victim, who was highly intoxicated, died from smoke inhalation and carbon monoxide poisoning.  <u>Id.</u> at 6.  According to defendant's version of events, he set the fire by putting a match to a paper bag containing trash found in a hallway.  <u>Id.</u> at 6.  The defendant maintained that he meant only to burn the garbage, believed the fire would self-extinguish, and did not intend for the fire to spread.  <u>Id.</u> at 6, 9.  The State's version of the setting of the fire was materially different from that of the defendant.  <u>Id.</u> at 6–7.  The State presented expert testimony that the fire was deliberately set by spreading an accelerant, kerosene, between the ground and second floors.  <u>Ibid.</u>

Defendant argued that supervening causes—including the presence of stored kerosene of which he claimed to be unaware, the flammability of the petroleum-based astroturf carpeting, open doors that allowed a rush of air to stoke the fire, and the inoperability of fire detectors—broke the chain of causation so that his conduct was not the legal cause of the victim's death.  <u>Id.</u> at 9–10.  Defendant thus argued that her death "was not a foreseeable, intended, or probable consequence of his conduct."  <u>Id.</u> at 9.

The Court concluded that in these circumstances, the defendant "was entitled . . . to a charge that if the jury believed that [the victim's] death occurred in a manner different from that designed or contemplated by defendant, it should

A-5586-18

decide whether her death was not too remote to have a just bearing on his liability." Id. at 16. The Court reasoned that

> [w]hen the actual result is of the same character, but occurred in a different manner from that designed or contemplated, it is for the jury to determine whether intervening causes or unforeseen conditions lead to the conclusion that it is unjust to find that the defendant's conduct is the cause of the actual result.
>
> [Id. at 13.]

In concluding that the trial court committed plain error by not instructing the jury on the principles of legal causation, the Court stressed, "[t]he need for an adequate charge on the question of causation is particularly compelling in the present case because the State and defendant offered contrasting theories of causation, each supported by expert testimony." Id. at 15 (quoting Green, 86 N.J. at 287–88). The Court added, "[w]hen, as here, divergent factual versions give rise to different theories of causation, the trial court should provide the jury with appropriate instructions, depending on which version it chooses to accept." Id. at 16–17.

Green, Parkhill, and Martin support our conclusion that the principles of legal causation need only be explained to the jury when causation is genuinely at issue based on the trial evidence and the theories of the prosecution and defense. There would have been no need in these cases to carefully analyze the facts if there were a categorical rule that the full causation model jury charge

A-5586-18

must always be given when a crime includes a result element, such as injury or death. Importantly for purposes of the present case, these precedents also provide helpful guidance as to when and in what circumstances the trial evidence suggests a disputed issue as to "remoteness, fortuity, or another's volitional act." Parkhill, 461 N.J. Super. at 504.

## D.

Applying these precedents to the case before us, we are satisfied that causation was not at issue. There certainly were divergent factual versions as to what transpired during the confrontation between defendant and Paulsen. In stark contrast to the situation in Martin, however, there were no divergent theories of causation for the jury to choose from. There were no "intervening causes or unforeseen conditions" as in Martin. Id. at 13. It bears emphasis, moreover, that counsel did not argue in summation that defendant's actions did not cause Paulsen's death.[33] Nor were there competing expert opinions on the cause of the victim's death. The medical examiner who performed the autopsy concluded that Paulsen died from an arrow wound to the abdomen that caused massive bleeding. The medical examiner explained the path of the "V-shaped"

---

[33] We note that in his appeals brief in the point challenging the admissibility of expert testimony on the effectiveness of archery equipment, which we address in section VII of this opinion, defendant acknowledges, "but the jury already knew that Paulsen was hit by an arrow as a result of defendant's actions." (emphasis added).

wound. "It went through the abdominal wall, the stomach, then struck a large vein called the iliac vein" and ended with a "partial exit on the back." The wound resulted in approximately "two and a half liters of blood within the abdomen," which "normally shouldn't [contain] any blood." The medical examiner noted that Paulsen had no preexisting conditions or diseases that could have contributed to his death.

In sum, our review of the trial record shows that no evidence was adduced that might be deemed to raise an issue as to remoteness, fortuity, or another's volitional act that would dissociate defendant's conduct from the ensuing result. Defendant offered neither evidence nor argument as to any circumstance that might complicate much less break the chain of causation between the release of the arrow and the victim's death. We are thus satisfied that defendant did not request a specific instruction on legal causation for the simple reason that causation was not an issue at trial. Rather, the defense theory hinged on defendant's claim that he acted in self-defense when he shot the arrow that caused the fatal wound. We therefore conclude that the causation charge delivered by Judge Ragonese was adequate and does not constitute error, much less plain error capable of producing an unjust result. R. 2:10-2.

A-5586-18

## VII.

Defendant next contends that the trial court committed plain error by admitting expert testimony concerning the crime-weapon and the manner in which it was used to cause the fatal wound. The State presented expert testimony to show the velocity of the arrow, how the bowstring had to have been drawn to achieve that velocity, and how the bow had to have been pointed directly at the victim in order for the arrow to penetrate his body as it did. The expert testimony contradicted defendant's version of events and his claims to police that the bowstring was not fully drawn and that arrow was not intended to strike the victim but rather was fired as a warning shot as defendant stumbled backwards.

Defendant did not object to the expert's trial testimony. He now argues for the first time on appeal that the expert's opinion did not assist the trier of fact to understand the evidence at trial or to determine a fact in issue. He also contends that the field of "archery equipment effectiveness" is not generally accepted within the scientific community. We reject these contentions and conclude that the trial court[34] did not abuse its discretion in admitting the expert's testimony pursuant to N.J.R.E. 702.

---

[34] We note that the Rule 104 hearing on the admissibility of the expert testimony was conducted by Judge Richard Wells.

## A.

Prior to trial, the State proposed to admit testimony from Andrew Kaufhold as an expert in archery equipment. Kaufold performed simulation tests using a bow and arrows that were substantially identical to the bow defendant owned and the arrow that struck and killed Paulsen. Kaufold performed experiments using the bow to shoot arrows at a pig[35] carcass to determine the velocity necessary for the arrow to penetrate the victim in the manner and to the degree indicated by the autopsy. Kaufhold also tested how far the bowstring needed to be pulled back to achieve that velocity.

Judge Wells conducted a Rule 104 hearing on the admissibility of Kaufhold's expert testimony. At the outset of the hearing, defense counsel stated that he had "no problem with [Kaufhold's] qualifications as an archery expert" but took issue with the "use of the pig carcass." At the conclusion of the hearing, Judge Wells determined that Kaufhold could testify as an expert but limited his testimony to his knowledge of archery equipment and the tests he used to measure arrow velocity. Judge Wells found that Kaufhold's testimony was "beyond the ken of a regular jury" and was "certainly within his expertise" given

---

[35] We note that the State occasionally refers to the carcass used in Kaufhold's tests as a "bovine" carcass. Upon review of the record, neither Kaufhold nor Dr. Jason Brooks use the phrase bovine. As such, we refer to the carcass used in the experiment as a pig carcass in accordance with the testimony of Kaufhold and Brooks.

A-5586-18

his knowledge and background. Judge Wells also found that the methodology Kaufhold used to measure the speed of a test-fired arrow and the machine he used to shoot those arrows were reliable.

However, Judge Wells initially ruled that Kaufhold would not be allowed to testify about the penetration tests that were conducted on the pig carcass. Judge Wells reasoned that Kaufhold "simply does not have credentials sufficient to come up here and tell the jury that . . . a [pig] carcass mirrors a human body, such that the penetration tests can be reliable as opposed to potentially going beyond it and tending to mislead or confuse a jury."

The State eventually cured that deficiency by presenting supplemental expert testimony from Dr. Jason Brooks, who was qualified as an expert in veterinary pathology.[36] Brooks testified that a pig carcass is a "reasonable simulant" with which to test the penetration and trauma inflicted by a bow and arrow wound on a human abdomen. Brooks explained that the skin, digestive tract, cardiovascular system, and urinary system found in the abdomen of pigs are similar to that of humans and that "the structure and location of blood vessels [in a pig abdomen] is almost identical to that of a human."

At trial before the jury, Kaufhold testified regarding the tests he performed using a 2010 PSE Whitetail Magnus Bow and 2009-2010 Carbon Express

---

[36] Defendant does not challenge the admission of Brooks' testimony on appeal.

Piledriver arrows—the same type of weapons owned and used by defendant. Kaufhold opined that:

> [I]n order for that bow and those arrows to produce enough velocity and energy for one of those arrows to approach a lethal amount of energy to penetrate a human being . . . the bow must have been drawn either 100 percent or, . . . given ou[r] test results, it could be argued, you know, very close to 100 percent.

Kaufhold explained that he reached this conclusion by using a shooting machine to fire arrows at a pig carcass at different "draws," referring to the degree to which the bowstring was pulled back before releasing the arrow. He charted the velocity of the arrows for each shot. He testified that the velocity test could "easily be replicated" and "was performed to shoot the bow in the manner in which it would be shot by a human being."

Kaufhold further explained that he used a pig carcass with similar weight and waist circumference as the victim and dressed the carcass in the identical brand, style, size, and type of clothing the victim wore on the night of the incident. In addition, Kaufhold explained that when aimed at the abdomen area of the carcass and fired at full draw, the arrow penetrated the abdomen in the same manner as occurred to the victim. Kaufhold also compared the marks on the clothing taken from the pig carcass to the actual clothes the victim wore. He testified that the damage to each set of clothing was nearly identical.

A-5586-18

99

Specifically, Kaufhold testified that the tests showed that the arrow penetrated the pig carcass's abdomen 16.5 inches at 100% draw, 11.5 inches at 75% draw, and six inches at 50% draw. At 25% draw, the arrow created "a very, very lazy arc toward the carcass. The arrow struck the carcass and fell harmlessly to the ground."

Kaufhold testified that, at full draw, the arrow reached the speed of 228 feet per second, which equates to approximately 155 miles per hour. He further testified, based on his expertise in archery equipment, that the bow used by defendant "is designed to be shot only at full draw" and that it would be "very hard and very uncomfortable to hold that bow at anything less than full draw." Kaufhold further opined that "for the arrow to strike where the arrow struck[,] the bow had to be aimed exactly where the arrow struck. Otherwise, it [the penetration] wouldn't have happened."

## B.

We next acknowledge the legal principles governing our review of defendant's contention that Kaufhold's testimony should have been excluded. As we have noted, defendant did not challenge Kaufhold's qualifications as an expert. Nor did defendant object to his testimony at trial. We need not repeat the case law that explains the plain error standard of appellate review. We add

A-5586-18

that the failure to object permits an inference that any error in admitting testimony was not prejudicial.  See State v. Nelson, 173 N.J. 417, 471 (2002).

In State v. Covil, our Supreme Court recently reaffirmed that "the trial court must act as gatekeeper to determine 'whether there exists a reasonable need for an expert's testimony.'"  240 N.J. 448, 465 (2020) (quoting State v. Nesbitt, 185 N.J. 504, 507–08 (2006)).  In Nesbitt, the Court noted that "[t]he failure of a defendant to object to expert testimony does not relieve the trial court of its gatekeeper responsibilities."  185 N.J. at 515.  However, it also is well-settled that a determination on the admissibility of expert testimony is committed to the sound discretion of the trial court.  Townsend v. Pierre, 221 N.J. 36, 52 (2015) (citing State v. Berry, 140 N.J. 280, 293 (1995)).  A trial court's grant or denial of a motion to preclude expert testimony, therefore, is entitled to deference on appellate review.  Ibid.

The admissibility of expert testimony is governed by N.J.R.E. 702.  That rule provides that "a witness qualified as an expert by knowledge, skill, experience, training, or education" may testify in the form of an opinion when "scientific, technical, or other specialized knowledge [would] assist the trier of fact to understand the evidence or to determine a fact in issue."  The party offering the evidence must establish three foundational requirements:

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror;

(2) the subject of the testimony must be at a state of the art such that an expert's testimony could be sufficiently reliable; and

(3) the witness must have sufficient expertise to explain the intended testimony.

[State v. Harvey, 151 N.J. 117, 169 (1997) (quoting State v. Kelly, 97 N.J. 178, 208 (1984)).]

In Kemp ex rel. Wright v. State, the Court cautioned that, "in cases in which the scientific reliability of an expert's opinion is challenged and the court's ruling on admissibility may be dispositive of the merits, the sounder practice is to afford the proponent of the expert's opinion an opportunity to prove its admissibility at a Rule 104 [hearing]." 174 N.J. 412, 432–33 (2002). A Rule 104 hearing "allows the [trial] court to assess whether the expert's opinion is based on scientifically sound reasoning or unsubstantiated personal beliefs couched in scientific terminology." Id. at 427 (citing Landrigan v. Celotex Corp., 127 N.J. 404, 414 (1992)).

During a Rule 104 hearing, the "expert must be able to identify the factual basis for his [or her] conclusion, explain his [or her] methodology, and demonstrate that both the factual basis and underlying methodology are scientifically reliable." Ibid. "The party offering the evidence bears the burden of proof." Harvey, 151 N.J. at 167 (citing Windmere, Inc. v. Int'l Ins. Co., 105 N.J. 373, 378 (1987)).

We note that in this case, Judge Wells took the prudent precaution of convening a Rule 104 hearing notwithstanding that defendant failed to challenge Kaufhold's qualifications and raised no concerns with his testimony other than with respect to his use of an animal carcass to perform the penetration tests.

C.

Applying the foregoing general principles to the matter before us, we conclude that Judge Wells made adequate findings to support his decision to admit Kaufhold's testimony. The judge determined that the subject-matter of the testimony was "certainly within [Kaufhold's] expertise, and beyond the ken of a regular jury." Judge Wells found the methodology used to test fire arrows and to measure their velocity reliable. The judge also found that Kaufhold's opinion was based on the tests he personally conducted. Judge Wells recognized that he was performing a "gatekeeper" function, aptly noting that defendant would be able to challenge the tests at trial, and that it was for the jury to decide the expert's credibility and the weight to accord to his testimony.

Defendant now contends that Kaufhold's "testimony and conclusions were unhelpful and irrelevant." We disagree. His testimony was properly admitted in the trial court's discretion to help the jury understand how defendant shot the arrow, which was disputed at trial. Defendant testified that he intentionally shot the arrow but not to strike Paulsen; rather defendant testified that he meant only

A-5586-18

to fire a "warning shot" as he was stumbling backwards.  Defendant was unable to recall how far the bowstring was drawn, but noted it was not fully drawn.

Kaufhold opined that "for the arrow to strike where the arrow struck[,] the bow had to be aimed exactly where the arrow struck.  Otherwise, it [the penetration] wouldn't have happened."  Kaufhold's testimony thus was relevant to the disputed question of whether defendant was aiming at Paulsen.[37] Furthermore, the expert's testimony, if believed, discredited defendant's account of what happened at the final stage of the fatal confrontation.  Indeed, defendant acknowledges in his appeals brief that his own testimony "contradicted Kaufold's conclusions because defendant testified he was not able to aim the arrow and that he was 'just grabbing the string.'"  That contradiction further demonstrates that Kaufhold's testimony was relevant to a "fact of consequence to the determination of the action."  N.J.R.E. 401.

We add that it was for the jury, ultimately, to reconcile the contradictory evidence presented by the State and by defendant.  In Espinal v. Arias, we noted in this regard that "[w]hile the trial judge must determine whether the expert's training and experience are sufficient to permit the expert to state an opinion, it remains the jury's function to determine the worth of that opinion."  391 N.J.

---

[37] We note that defendant at trial did not object that the expert used the word "aim" rather than "point."  We also note that Kaufhold did not render an opinion as to defendant's state of mind at the moment the arrow was fired.

A-5586-18

Super. 49, 58 (App. Div. 2007) (citing <u>Sanzari v. Rosenfeld</u>, 34 N.J. 128, 138 (1961)).

D.

Defendant also argues in his appeals brief that "[t]he [p]rosecutor unfairly took advantage of the erroneously admitted Kaufhold testimony by arguing in summation that '[t]he arrow is aimed at [Paulsen]. The arrow couldn't have struck [Paulsen] unless it was aimed at [Paulsen]. The arrow did not just go in a swerving pattern and hit [Paulsen].'" We reject defendant's argument. For one thing, defendant did not object to the prosecutor's summation when it was given. The failure to make a timely objection indicates that defense counsel did not believe at the time that the prosecutor had unfairly taken advantage of Kaufhold's testimony within the atmosphere of the trial. <u>See</u> <u>State v. Irving</u> 114 N.J. 427, 444 (1989) (citing <u>State v. Johnson</u>, 31 N.J. 489, 511 (1960)) (noting, "defense counsel's failure to make an objection at trial creates an inference that he did not find the prosecutor's remarks prejudicial"); <u>cf.</u> <u>State v. Ramseur</u>, 106 N.J. 123, 323 (1987) ("If no objection is made, the remarks usually will not be deemed prejudicial."). We believe the prosecutor's argument in summation was a fair and appropriate use of the expert's testimony with regard to the disputed question of whether the bow had been targeted at Paulsen when the arrow was released.

A-5586-18

We add that the prosecutor—and ultimately the jury—could draw a fair inference that the arrow had been aimed at the target it was pointed at when it was released. We acknowledge that there was testimony that defendant was stumbling backwards. As we noted during our discussion of causation, the jury was presented with the question of whether defendant acted recklessly rather than intentionally. It thus was for the jury to decide whether the arrow had been <u>intentionally</u> aimed at Paulsen or whether it just happened to be pointed in his direction at the moment of release.

We certainly agree with defendant's argument on appeal that the mere fact that the arrow struck the victim and did not bounce off him "was not conclusive evidence about defendant's intention." But, evidence does not have to be "conclusive" to be relevant and admissible. We note that the model jury charge for "State of Mind" explains that:

> Purpose/knowledge/intent/recklessness/negligence
> is/are condition(s) of the mind which cannot be seen
> and can only be determined by inferences from conduct,
> words or acts.
>
> A state of mind is rarely susceptible of direct proof, but
> must ordinarily be inferred from the facts.
>
> [<u>Model Jury Charges (Criminal)</u>, "State of Mind"
> (approved Jan. 11, 1993).]

In this instance, the manner in which defendant handled and deployed the weapon was relevant to whether he had aimed it directly at defendant or instead

intended to miss Paulsen, as defendant testified. Aside from bearing on defendant's intention at the moment he shot the arrow, the expert opinion evidence that defendant acknowledges "contradicted" his own testimony was relevant to whether defendant's version of events was credible. Just as it was for the jury to decide whether Kaufhold's expert opinion was credible, it also was for the jury to decide whether defendant was a credible witness.

In sum, we conclude that Judge Wells did not abuse his discretion or otherwise err in qualifying Kaufhold as an expert in archery equipment effectiveness and allowing him to testify at trial about the tests he performed and relied upon to reach his conclusions. To the extent we have not specifically addressed any remaining arguments defendant raises with respect to Kaufhold's testimony, those arguments lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

## VIII.

Defendant contends that the trial court erred in allowing DeFilippis to testify that Thomas Dulin, defendant's father-in-law, "concocted a story that defendant shot Paulsen in self-defense." Specifically, defendant claims on appeal that the following passage from DeFillipis' testimony constitutes inadmissible hearsay:

> Mr. [Thomas] Dulin was there waiting for us . . . .
> [T]here was . . . a family meeting of everybody that was

A-5586-18

107

involved. And they came up with the story that we're going to say Kereti [Paulsen] had an HIV positive needle, so it was self-defense instead of him just shooting an arrow at somebody he didn't like. And everybody spoke about it. And I guess they had c[o]me to kind of an agreement that that's what we're going to say, and we're going to plead self-defense on this, try to get Tim the least time possible for what happened.

Defendant did not object to this testimony at trial.[38] Rather, defendant presented testimony from several witnesses, including Thomas Dulin, who claimed that the family meeting described by DeFilippis never happened. It thus appears that defense counsel may have made a strategic decision not to object

---

[38] We note that the introduction of testimony that the self-defense claim was fabricated and that there was a family-wide plan to support that defense stratagem was hardly a surprise at trial. The State disclosed in discovery that DeFilippis contacted authorities in 2016 to reveal such a plan. We believe that any hearsay concerns regarding evidence of the family meeting at which the alleged plan was first discussed should have been addressed in limine before DeFilippis testified at trial.

We have concerns about the practical implications of defendant's plain error argument, which presupposes that a trial judge has a duty to interrupt testimony sua sponte as hearsay when the defendant does not object to the testimony on those grounds. In general, it is not the judge's role or responsibility to intervene with a well-founded hearsay objection when counsel chooses not to raise one of his or her own. Cf. N.J. Div. of Child Prot. & Permanency v. J.D., 447 N.J. Super. 337, 349 (App. Div. 2016). We note, however, that the State does not argue that defendant has waived the right to challenge the admissibility of this portion of DeFilippis' testimony as plain error. Rather, the gravamen of the State's response is that "the admission of the hearsay statements was entirely proper pursuant to the co-conspirator exception to the hearsay rule."

A-5586-18

so as to provide an opportunity to introduce conflicting testimony to challenge DeFilippis' overall credibility.[39]

Defendant now raises a hearsay challenge for the first time on appeal, arguing that the trial court on its own volition should have interceded and precluded DeFilippis from testifying as to what transpired during the alleged family meeting when the agreement to support a fabricated self-defense claim was first discussed.[40] On appeal, the State does not argue that DeFilippis' testimony concerning the alleged family discussion does not constitute hearsay. Rather, the State argues that the testimony relating to the alleged family meeting is admissible under the co-conspirator exception to the hearsay rule, N.J.R.E. 803(b)(5).

---

[39] We note that defendant may have been less concerned with DeFilippis' testimony regarding the family meeting than with his testimony that defendant called him years after the incident to convince him to "stick to the story" concerning Paulsen's possession of a hypodermic syringe. DeFilippis' testimony about the meeting provided an opportunity to challenge his overall credibility through the testimony of multiple witnesses who flatly contradicted his account of the family meeting.

[40] We note that defendant on appeal argues that the statement was inadmissible hearsay and that none of the elements of the co-conspirator exception have been established. Defendant does not argue in his appeals brief that the statement violates his confrontation rights under the Sixth Amendment. See Savage, 172 N.J. at 402; see also Bourjaily v. United States, 483 U.S. 171, 182 (1987).

A.

In these circumstances, we decline to apply the general principle that hearsay, which is subject to a well-founded objection, is generally evidential if no objection is made. State v. Ingenito, 87 N.J. 204, 224 n. 1 (1981) (Schreiber, J., concurring); see also Morris v. United States, 813 F.2d 343, 348 (11th Cir. 1987) (emphasis added) (quoting Spiller v. Atchison, Topeka & Sante Fe Ry. Co., 253 U.S. 117 (1920)) (stating that "if evidence of this kind [that is, hearsay] is admitted without objection, it is to be considered, and accorded its natural probative effect, as if it were in law admissible"); J.A. Bock, Consideration, in determining facts, of inadmissible hearsay evidence introduced without objection, 79 A.L.R.2d 890 (2014) (stating that "overwhelming weight of authority" supports the rule that inadmissible hearsay may be considered evidential when it enters the record without objection, and it "should be given its natural and logical probative effect"); Kenneth S. Broun, 1 McCormick on Evidence § 245 at 181 (7th ed. 2013) ("If otherwise inadmissible hearsay evidence is received without objection, it typically may be considered and, if apparently reliable, is sufficient to sustain a verdict or finding of fact."); id. § 54 at 381.

Rather, because this is a criminal matter affecting substantial rights, we instead follow the lead of our Supreme Court in State v. Frisby, which noted that

"[b]ecause no objection was advanced with respect to [the] hearsay evidence [introduced] at trial, it must be judged under the plain-error standard: that is, whether its admission 'is of such a nature as to have been clearly capable of producing an unjust result.'" 174 N.J. 583, 591 (2002) (quoting R. 2:10-2); see Smith v. United States, 343 F.2d 539, 542 (5th Cir. 1965) (citations omitted) ("If there is no timely objection to hearsay, the jury may consider it for whatever probative value it may have. The courts, however, may still reverse a conviction based on hearsay evidence if there has been a plain error affecting substantial rights of the accused."). We add that "when counsel does not make a timely objection at trial, it is a sign 'that defense counsel did not believe the remarks were prejudicial' when they were made." State v. Pressley, 232 N.J. 587, 594 (2018) (quoting State v. Echols, 199 N.J. 344, 360 (2009)). The absence of objections "weighs against [the] defendant's claim that errors were 'clear' or 'obvious.' Indeed, '[i]t [is] fair to infer from the failure to object below that in the context of the trial the error was actually of no moment.'" Nelson, 173 N.J. 417, 471 (2002) (alterations in original) (quoting State v. Macon, 57 N.J. 325, 333 (1971)).

## B.

We next briefly summarize the governing law on the hearsay doctrine. The familiar rule generally provides that "[a] statement, made other than by the

witness while testifying, offered to prove the truth of the content of the statement is hearsay evidence and is inadmissible unless it falls within one of the hearsay exceptions." Savage, 172 N.J. at 402 (quoting State v. Phelps, 96 N.J. 500, 508 (1984)). "The co-conspirator exception to the hearsay rule, embodied in N.J.R.E. 803(b)(5), provides that statements made 'at the time the party and the declarant were participating in a plan to commit a crime' and 'made in furtherance of that plan,' are admissible into evidence against another member of the conspiracy." Ibid. (quoting N.J.R.E. 803(b)(5)).

Under this exception, "[w]here two or more persons are alleged to have conspired to commit a crime, any statement made by one during the course of and in furtherance of the conspiracy is admissible in evidence against any other member of the conspiracy." State v. Harris, 298 N.J. Super. 478, 487 (App. Div. 1997) (first citing N.J.R.E. 803(b)(5); and then citing Phelps, 96 N.J. at 508). This exception may apply even when the defendant is not formally charged with the crime of conspiracy. See State v. Clausell, 121 N.J. 298, 336–37 (1990) (citing State v. Carbone, 10 N.J. 329, 338–39 (1952) ("Absence of a conspiracy charge does not necessarily negate the admissibility of a co-conspirator's statements.")); State v. Baluch, 341 N.J. Super. 141, 183–84 (App. Div. 2001) (citations omitted) ("There is no requirement that defendants be charged with conspiracy in order for the [hearsay exception] to apply.").

In Phelps, the Supreme Court recognized that admitting evidence of a co-conspirator's statement may advance the goal of discerning where the truth lies, considering that a conspiratorial agreement may be "effectuated through unwritten statements passed from one to another." 96 N.J. at 509. The Court noted, "[i]t has been said, 'silence, furtiveness and secrecy shroud the conduct and speech of coconspirators.'" Ibid. (citation omitted). Thus, "[c]o[-]conspirator's hearsay may be essential to establishing the existence of an illicit agreement." Ibid. (citation omitted).

A hearsay statement is admissible under the co-conspirator exception if the following conditions are met: "(1) the statement must have been made in furtherance of the conspiracy; (2) the statement must have been made during the course of the conspiracy; and (3) there must be 'evidence, independent of the hearsay, of the existence of the conspiracy and defendant's relationship to it.'" Savage, 172 N.J. at 402 (quoting Phelps, 96 N.J. at 509–10).

A statement is considered to have been made "in furtherance of the conspiracy" if the statement "serves a 'current purpose such as to promote cohesiveness, provide reassurance to a coconspirator or prompt one not a member of the conspiracy to respond in a way that furthers the goal of the conspiracy.'" State v. James, 346 N.J. Super. 441, 457–58 (App. Div. 2002) (quoting State v. Taccetta, 301 N.J. Super. 227, 253 (App. Div. 1997)). In

James, we held that a statement made by a co-conspirator in an effort to enlist aid or support in disposing of a weapon used in the commission of the crime was made in furtherance of the conspiracy. Ibid.

As for the third element, "[t]he trial court must make a preliminary determination of whether there is independent proof of the conspiracy." Savage, 172 N.J. at 403 (citing N.J.R.E. 104(b)). "[T]he trial court must determine whether there is independent evidence 'substantial enough to engender a strong belief in the existence of the conspiracy and of [the] defendant's participation.'" Ibid. (quoting Phelps, 96 N.J. at 519). "The requisite independent evidence may take many different forms, 'such as books and records, testimony of witnesses, or other relevant evidence. There may be a combination of different types of proof.'" Ibid. (quoting Phelps, 96 N.J. at 511). "[T]he prosecution has the burden of satisfying the third part of the test by a fair preponderance of the evidence." State v. Farthing, 331 N.J. Super. 58, 84 (App. Div. 2000) (citations omitted).

## C.

In this instance, defendant's failure to object to DeFilippis' testimony deprived the trial judge the opportunity to make explicit findings concerning the elements of the co-conspirator exception. It also deprived the State an

opportunity to marshal its fact-sensitive arguments to establish the elements of the exception.

In contrast to the situation addressed in section V where the record allowed us to determine with confidence that defendant was not in his dwelling when he fired the arrow, a ruling on the co-conspirator exception requires a more nuanced assessment, especially regarding whether there was adequate independent proof of a conspiracy. Had there been a timely objection, the prosecutor might have presented additional proofs at a Rule 104 hearing. In these circumstances, we find it most prudent to remand the matter for the trial court to convene a 104 hearing to consider the admissibility of this testimony and make appropriate findings. See State v. Stubbs, 433 N.J. Super. 273, 289 (App. Div. 2013) (remanding for the trial court to conduct a Rule 104 hearing to determine if the State had met its burden to establish whether a hearsay document was admissible as an adoptive admission). We believe it inappropriate for us to exercise original jurisdiction to determine, based on the current record, whether the three elements of the co-conspirator exception have been established. See R. 2:10-5 (allowing appellate court to exercise original jurisdiction to eliminate unnecessary further litigation, but discouraging its use if factfinding is involved); State v. Santos, 210 N.J. 129, 142 (2012) (explaining that Rule 2:10-5 allows an appellate court to exercise original jurisdiction, but

by exercising original jurisdiction, the court "would be addressing an evidentiary matter that should be addressed, on the record, in the first instance, by the [trial] court").

The remand shall be completed within ninety (90) days of this opinion. We do not retain jurisdiction. If the trial court determines that the statement is inadmissible, the court shall order a new trial unless the court concludes that the admission of this testimony was not capable of producing an unjust result given the other proofs, the prosecutor's summation,[41] and whether defense counsel's decision not to object was a strategic decision. Following the issuance of the trial court's ruling on remand, the parties shall have forty-five (45) days within which to appeal an adverse ruling.

We by no means prescribe the outcome on remand and nothing in this opinion should be construed as expressing our view on whether DeFilippis' testimony falls within the co-conspirator exception or, if not, whether its admission constituted plain error capable of producing an unjust result. R. 2:10-2.

---

[41] We note that the prosecutor's summation did not mention DeFilippis' statement regarding the family meeting.

IX.

Defendant contends that the trial court erred in admitting a photograph of a hypodermic syringe that police found during a search of Trisha's bedroom. Defendant objected to the admission of the photograph, arguing that it constitutes evidence of a crime or bad act other than the one for which he was tried and thus is inadmissible under N.J.R.E. 404(b). After reviewing the record in light of the governing principles of law, we conclude the trial court properly denied defendant's objection.

During a search of Trisha's bedroom, police found controlled substances and an orange-capped hypodermic syringe. The syringe was substantially identical to an orange-capped syringe found near Paulsen's body. The State sought to introduce a photograph of the syringe that had been recovered from Trisha's bedroom. Defense counsel objected, arguing that the photograph was not relevant and was evidence of an uncharged crime and thus barred by Rule 404(b). The State argued that the photograph was relevant to show that defendant had ready access to such syringes. Such access, the State argued, was relevant to the prosecution theory that defendant's self-defense claim was fabricated and that he planted the syringe that was found in the backyard to support his claim that Paulsen had approached him while wielding a syringe. The State thus argued that the photograph was intrinsic evidence of the

A-5586-18

117

underlying murder. Judge Ragonese agreed with the State's argument and admitted the photograph over defendant's objection.

As a general matter, "[e]videntiary rulings made by the trial court are reviewed under an abuse-of-discretion standard." State v. Scharf, 225 N.J. 547, 572 (2016) (citing Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008)). "[R]elevant evidence may be excluded if its probative value is substantially outweighed by the risk of . . . undue prejudice." N.J.R.E. 403. "The trial court is granted broad discretion in determining both the relevance of the evidence to be presented and whether its probative value is substantially outweighed by its prejudicial nature." Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999). This court "will reverse an evidentiary ruling only if it 'was so wide of the mark that a manifest denial of justice resulted.'" State v. Mauti, 448 N.J. Super. 275, 307 (App. Div. 2017) (quoting Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016)). When, however, "the trial court fails to apply the proper legal standard in determining the admissibility of proffered evidence," we review the evidentiary ruling de novo. State v. Williams, 240 N.J. 225, 234 (2019).

N.J.R.E. 404(b) generally prohibits the use of evidence that a defendant committed a crime or bad act other than one for which he or she is being tried. The danger of prejudice expressed in Rule 404(b) is that the jury may view evidence of any such bad act or other crime as proof of the defendant's

propensity to violate the law. Such evidence may, however, be admissible to establish a "common scheme or plan, a signature crime, motive, and most frequently, to impeach the accused who takes the witness stand, but only through a conviction." State v. Weeks, 107 N.J. 396, 406–07 (1987) (citations omitted).

The standard and prerequisites for admitting "other crimes" evidence pursuant to Rule 404(b) are more rigorous than the relevance standard that generally applies. In State v. Cofield, the Court described the higher standard as "special relevance." 127 N.J. 328, 338 (1992). The Court distilled a rule designed to "avoid the over-use of extrinsic evidence of other crimes or wrongs." Ibid. That rule requires that:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;
>
> 3. The evidence of the other crime must be clear and convincing; and
>
> 4. The probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [Ibid. (citation omitted)].

Importantly for purposes of this appeal, "[t]he threshold determination under Rule 404(b) is whether the evidence relates to 'other crimes,' and thus is subject to continued analysis under Rule 404(b), or whether it is evidence

intrinsic to the charged crime, and thus need only satisfy the evidence rules relating to relevancy, most importantly Rule 403." State v. Rose, 206 N.J. 141, 179 (2011). Accordingly, before a court determines whether a prior bad act is admissible for a particular purpose authorized by Rule 404(b), it must determine first whether the evidence, in fact, relates to a prior bad act, or whether instead it is intrinsic to the underlying crime. See State v. Brockington, 439 N.J. Super. 311, 325 (App. Div. 2015) (citing Rose, 206 N.J. at 179 (2011)). Evidence that is intrinsic to the crime for which the defendant is being tried need not satisfy the requirements of Rule 404(b), but rather need only satisfy the general rules of relevance and prejudice. Rose, 206 N.J. at 177–78. Intrinsic evidence encompasses two categories: (1) evidence that "directly proves" the charged offense and (2) evidence that, when performed contemporaneously with the charged crime, facilitates the commission of the charged crime. Brockington, 439 N.J. Super. at 327–28 (quoting State v. Green, 617 F.3d 233, 248 (3d Cir. 2010)).

Applying these general principles, the critical threshold issue before us is whether the photograph of the syringe was admitted as evidence of a bad act or crime other than the murder and hindering charges for which defendant was being tried. We conclude that in this instance, defendant's Rule 404(b) contention proceeds from a mistaken premise. The State was not using the

photograph to show that defendant unlawfully possessed the depicted syringe in violation of N.J.S.A. 2C:36-6 (prohibiting the possession with intent to use a hypodermic syringe to inject a controlled dangerous substance). Indeed, the State did not contend that defendant had ever handled the specific syringe that was depicted in the photograph.

Nor was the photograph offered to show that defendant was an intravenous drug user or to show any other aspect of his character or propensity to violate the law. Rather, the photograph was offered to show that syringes identical to the one found near Paulsen's body were readily accessible to defendant because they were kept in Trisha's bedroom inside the house that defendant lived in. The photograph was proffered to rebut defendant's claim that he acted in self-defense by showing that defendant had access to such syringes and thus had the means to plant a syringe near the crime scene to bolster his claim that Paulsen was armed with a syringe when he approached defendant during their confrontation.

The State had the burden at trial to disprove the affirmative defense of use of force in self-protection beyond a reasonable doubt. See N.J.S.A. 2C:1-13(b)(1). The prosecution's rebuttal theory was that the self-defense claim had been fabricated after Paulsen was killed, and that the syringe found near the victim's body had been planted to support the self-defense stratagem. In these circumstances, evidence that showed (1) that defendant had access to Trisha's

syringes inside the house, and (2) that her syringes were identical to the one found near Paulsen's body, satisfies the definition of intrinsic evidence. Such evidence would "directly prove" the murder charge, see Brockington, 439 N.J. Super. at 327–28, by tending to disprove defendant's self-defense claim. Accordingly, the State was not required to satisfy the preconditions for admissibility of Rule 404(b) other crimes evidence spelled out in Cofield, 127 N.J. at 338.

We likewise reject defendant's fallback argument on appeal that under the "'less searching inquiry' demanded under N.J.R.E. 403, the admission was still error." N.J.R.E. 403 provides:

> Except as otherwise provided by these rules or other law, relevant evidence may be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury; or (b) undue delay, waste of time, or needless presentation of cumulative evidence.

Evidence is deemed to be relevant if it has "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. Evidence is deemed to be unduly prejudicial, in turn, "when its 'probative value is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation' of the issues in the case.'" State v. Koskovich, 168 N.J. 448, 486 (2002) (quoting State v. Thompson, 59 N.J. 396, 421 (1971)).

As we have already noted, the photograph was relevant because it had a tendency to show that defendant had the wherewithal to plant the syringe that was found near Paulsen's body; this evidence thus was probative to rebut defendant's claim of self-defense. The photograph, moreover, was not inflammatory or otherwise unduly prejudicial as to significantly outweigh its probative value because it was not proffered to show, for example, that defendant was an intravenous drug user or was somehow predisposed to violate the law. In these circumstances, we conclude that the trial judge did not abuse his broad discretion in admitting the photograph over defendant's objection. See Green, 160 N.J. at 492; Mauti, 448 N.J. Super. at 307.

## X.

## A.

Finally, we address defendant's sentencing contentions. Defendant first argues that a remand is needed for the sentencing court to apply a statutory mitigating factor that was enacted on October 19, 2019, after the homicide and the sentencing proceeding. See L. 2020, c. 110; see also A. 4373 (2020). Mitigating factor fourteen, N.J.S.A. 2C:44-1(b)(14), now establishes a mitigating circumstance when "[t]he defendant was under 26 years of age at the time of the commission of the offense." It is not disputed that defendant was

under twenty-six years of age when the homicide occurred on January 28, 2013.[42]

Defendant argues the Legislature intended for the new mitigating factor to apply retroactively. The State argues the new factor should be given prospective effect only. This question is now pending before the Supreme Court, which granted certification in State v. Lane, No. A-17-21. In that case, the Court will address, "[d]oes mitigating factor fourteen, N.J.S.A. 2C:44-1(b)(14), that the 'defendant was under 26 years of age at the time of the commission of the offense,' apply retroactively?" Id.

In State v. Bellamy, we recently addressed the retroactivity question, noting that the "savings statute [N.J.S.A. 1:1-15] codifies the general rule that a new law applies prospectively only, not affecting offenses and penalties incurred prior to its enactment, unless the Legislature expresses a clear intent to the contrary." 468 N.J. Super. 29, 43 (App. Div. 2021) (citing State v. J.V., 242 N.J. 432, 443 (2020), as revised (June 12, 2020)). We acknowledged, however, that:

> Among the recognized exceptions to the presumption against retroactive application of a law is that the statute is ameliorative or curative . . . . Under [this] exception . . . the term ameliorative refers only to criminal laws that effect a reduction in a criminal

---

[42] Defendant, by our calculation, was twenty-five years, six months, and sixteen days old at the time of the commission of the offense.

A-5586-18

penalty. The ameliorative amendment must be aimed at mitigating a legislatively perceived undue severity in the existing criminal law.

[Id. at 46 (citations and quotations omitted).]

We added that the Legislature tacitly acknowledged such a purpose in the committee statement to the Assembly Bill, which explains that,

Current law provides [thirteen] mitigating factors that the court may consider when sentencing a defendant. The only mitigating factor related to the age of a youthful defendant permits the court to consider whether the defendant's conduct was substantially influenced by another, more mature person. Under the bill's provisions, the court would be permitted broadly to consider as a mitigating factor whether a defendant was under the age of [twenty-six] when an offense was committed.

[Id. at 46 (alteration in original) (citing Assembly Law & Pub. Safety Comm. Statement to Assembly, A. 4373 (July 20, 2020)).]

We concluded that, "[u]nquestionably, the Legislature wanted to fill a void in N.J.S.A. 2C:44-1(b) by making a convicted person's youth a standalone factor in the court's sentencing calculus. This draws the new mitigating factor in line with other statutes deemed to satisfy the ameliorative exception and justifies 'retroactive' applicability." Id. at 46–47. We also recognized that "[t]he inclusion of an additional mitigating factor has the potential to effect a 'reduction of a criminal penalty[,]' thereby rendering N.J.S.A. 2C:44-1(b) ameliorative." Id. at 47.

A-5586-18

125

Although we thus suggested that the new mitigating factor is ameliorative, we made clear that "[t]his is not intended to mean cases in the pipeline in which a youthful defendant was sentenced before October 19, 2020, are automatically entitled to a reconsideration based on the enactment of this statute alone. Rather, it means where, for a reason unrelated to the adoption of the statute, a youthful defendant is resentenced, he or she is entitled to argue the new statute applies." Id. at 48.

Relatedly, recently in State v. Rivera, __ N.J. __ (2021), our Supreme Court reversed and remanded for resentencing when the trial court improperly considered the defendant's youth as an aggravating factor. Although the Court did not address the retroactivity of the new statutory mitigating factor, the Court concluded that "the [trial] court on resentencing is free to consider defendant's youth at the time of the offense and apply mitigating factor fourteen, which was given immediate effect in all sentencing proceedings on or after October 19, 2020." Id. at __ (slip op. at 22).

In the present matter, although we are not remanding the case for resentencing, we are remanding for the trial court to make findings with respect to the co-conspirator exception to the hearsay rule. We deem it prudent for the trial court to use the occasion of the remand on the evidentiary issue to also consider whether the sentence would have been different accounting for the new

mitigating factor. That would avoid the necessity for yet an additional remand should the Supreme Court ultimately decide that N.J.S.A. 2C:44-1(b)(14) applies retroactively. We do not require the trial court to convene a new sentencing hearing and leave to the court's discretion whether to require or permit the parties to present oral argument or submit briefs concerning defendant's youth as a mitigating circumstance. We also leave to the trial court's discretion whether to modify the sentence in view of the new mitigating factor or to amplify the reasons for imposing sentence. Cf. R. 2:5-1(b) (authorizing the trial judge to provide an amplification of a prior statement or opinion when an issue is raised on appeal).

### B.

We proceed to address defendant's remaining sentencing arguments. Specifically, he argues that the sentencing court's findings concerning aggravating factor one, N.J.S.A. 2C:44-1(a)(1), and mitigating factor three, N.J.S.A. 2C:44-1(b)(3), were not supported by competent, credible evidence in the record. Defendant also contends that the trial court erred in denying his request for a sentence downgrade pursuant to N.J.S.A. 2C:44-1(f)(2). Because that statutory feature entails a balancing of the applicable aggravating and mitigating circumstances, we consider all of the findings made by the sentencing

court and not just its findings concerning the specific aggravating factor and mitigating factor that defendant disputes.

We begin our substantive analysis of defendant's sentencing contentions by acknowledging that the scope of our review of sentencing decisions is narrow. As a general matter, sentencing decisions are reviewed under a highly deferential standard. See State v. Roth, 95 N.J. 334, 364–65 (1984) (holding that an appellate court may not overturn a sentence unless "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience"). Our review is therefore limited to considering:

> (1) whether guidelines for sentencing established by the Legislature or by the courts were violated; (2) whether the aggravating and mitigating factors found by the sentencing court were based on competent credible evidence in the record; and (3) whether the sentence was nevertheless "clearly unreasonable so as to shock the judicial conscience."
>
> [State v. Liepe, 239 N.J. 359, 371 (2019) (quoting State v. McGuire, 419 N.J. Super. 88, 158 (App. Div. 2011)).]

"[A]ppellate courts are cautioned not to substitute their judgment for those of our sentencing courts." State v. Case, 220 N.J. 49, 65 (2014) (citing State v. Lawless, 214 N.J. 594, 606 (2013)). Relatedly, a trial court's exercise of

discretion that is in line with sentencing principles "should be immune from second-guessing." State v. Bieniek, 200 N.J. 601, 612 (2010).

With respect to the consideration of aggravating and mitigating circumstances, "the [sentencing] court must describe the balancing process leading to the sentence." State v. Kruse, 105 N.J. 354, 360 (1987) (citations omitted). "To provide an intelligible record for review, the trial court should identify the aggravating and mitigating factors, describe the balance of those factors, and explain how it determined defendant's sentence." Ibid. "Merely enumerating those factors does not provide any insight into the sentencing decision, which follows not from a quantitative, but from a qualitative, analysis." Id. at 363 (citing State v. Morgan, 196 N.J. Super. 1, 5 (App. Div. 1984)).

In this instance, Judge Ragonese performed a commendably thorough and detailed analysis of the relevant circumstance pertaining both to the circumstances in which the offense was committed and the offender's background. After reviewing defendant's presentence report, Judge Ragonese found that defendant "had prior contact with the court system." As a juvenile, "defendant was adjudicated delinquent for endangering the welfare of a child. He was sentenced to a three-year term of probation. He violated probation and was sentenced to continued probation as a result of that violation." The judge

found that as an adult, "defendant successfully completed pretrial intervention after being charged with third-degree criminal trespass. He has no municipal court convictions, no restraining orders, and the present conviction is his first conviction for an indictable offense."

The court also found that defendant was married and the father of one child. The judge noted that "defendant lived with his wife and children in a home in Berlin. The presentence report indicates defendant is a high school graduate. He has historically been employed in the auto repair industry serving as the primary income earner for his family." The judge also found that defendant has no history of drug abuse.

The court next considered the relevant statutory aggravating and mitigating factors. The court found aggravating factor one, N.J.S.A. 2C:44-1(a)(1) ("[t]he nature and circumstances of the offense, and the role of the actor in committing the offense, including whether or not [the crime] was committed in an especially heinous, cruel, or depraved manner[.]"). The court explained:

> The credible evidence showed that when defendant came upon the victim, bleeding and nearing his last breath, a neighbor came out of his home to check on the noise he had heard. When the neighbor asked if the person he saw on the ground was okay, defendant lied and told the neighbor that the victim had drunk to[o] much. The neighbor then went back in his home.
>
> One can only imagine what the victim was thinking at that moment, as he realized that the only person who

A-5586-18

130

could possibly help him was the person who had just shot him with an arrow, and that potential help had just been pushed away by the perpetrator of this crime. Based upon this fact, the [c]ourt finds [a]ggravating [f]actor [one] applies and gives it moderate weight.

The judge also found aggravating factor three, N.J.S.A. 2C:44-1(a)(3) ("[t]he risk that defendant will commit another offense").  The judge found that given defendant's prior juvenile history and his violation of probation as a juvenile, "there [was] a slight risk that defendant [would] commit another crime."  However, the court gave this aggravating factor minimal weight because defendant had no adult criminal convictions.

The court also found aggravating factor nine, N.J.S.A. 2C:44-1(a)(9) ("[t]he need for deterring the defendant and others from violating the law").  The court explained that the need to deter defendant was particularly acute "because defendant took the law into his own hands."  The court gave aggravating factor nine moderate weight.

The court next carefully considered the statutory mitigating factors.  The court found mitigating factor five, N.J.S.A. 2C:44-1(b)(5) ("[t]he victim of the defendant's conduct induced or facilitated its commission").  The judge noted that the victim was trespassing on the property on the night of the incident and refused the family's repeated requests to leave.  The court nonetheless gave mitigating factor five minimal weight.

The court also found mitigating factor eight, N.J.S.A. 2C:44-1(b)(8) ("[t]he defendant's conduct was the result of circumstances unlikely to recur") and gave that factor moderate weight. The court explained:

> Here, defendant's conduct was shooting an arrow from a compound bow at a person and then trying to cover it up. This conduct was the only instance of violence in defendant's history. Moreover, the circumstances that led to defendant's conduct were specific to this victim and the unique relationship the victim had to the Dulin Family.
>
> The fight that preceded defendant's confrontation with the victim was spontaneous and specific to the events that immediately preceded the fight. Therefore, the [c]ourt concludes that [m]itigating [f]actor [eight] applies because defendant's conduct was the result of circumstances that [are] unlikely to recur in the future.

The court acknowledged and distinguished its finding that aggravating factor three applied, explaining that even though it found there was some risk that defendant would commit another crime, it was not necessarily a risk that defendant would commit a crime involving violence or death.

The court also found mitigating factor eleven, N.J.S.A. 2C:44-1(b)(11) ("[t]he imprisonment of the defendant would entail excessive hardship to the defendant or the defendant's dependents"), and gave that mitigating circumstance moderate weight. The court explained that the credible evidence showed that defendant was the sole income earner for his family, and that incarceration would therefore result in severe financial hardship to his son.

The court also found mitigating factor twelve, N.J.S.A. 2C:44-1(b)(12) ("[t]he willingness of the defendant to cooperate with law enforcement authorities"), but only with respect to defendant's conviction for hindering. The court explained that "[a]fter defendant hid the bow and arrow, impersonated the victim and lied to police, he brought police to the hiding spot." The court further noted that, shortly after committing the crimes, defendant admitted his role in the victim's death and that he reenacted the incident leading to the death of the victim. The court nonetheless gave mitigating factor twelve "de minimis weight" because defendant initially deceived police and other first responders.

The court refused defendant's request to apply mitigating factor three, N.J.S.A. 2C:44-1(b)(3) ("[t]he defendant acted under a strong provocation"), reasoning that the evidence showed that "defendant was the one who created the circumstances that led to the victim's death. He was the one who chose to leave his home when he could have called the police. He was the one who brought a weapon outside." The judge added, "If there was any provocation to this crime, it was defendant who created it."

The court also refused defendant's request to apply mitigating factor four, N.J.S.A. 2C:44-1(b)(4) ("[t]here were substantial grounds tending to excuse or justify the defendant's conduct, though failing to establish a defense"). The court reasoned, "[d]efendant was the one who initiated [the] encounter. He had

ample time to consider an alternative, but he chose one that ended up destroying two families . . . . There is no evidence that tends to excuse or justify defendant's conduct."

In view of the sentencing court's thoughtful and explicit analysis, we conclude the court did not abuse its discretion in applying aggravating factor one and declining to apply mitigating factor three and four. Both determinations are supported by competent credible evidence. We note that in this instance, the sentencing judge had presided over the trial and thus was intimately familiar with the trial evidence concerning the nature and circumstances of the offense and the victim's conduct leading up to the homicide.

## C.

We next address defendant's contention that the trial court abused its discretion in declining defendant's request to invoke the sentence downgrade provision codified in N.J.S.A. 2C:44-1(f)(2). The court weighed the aggravating and mitigating factors and found that the aggravating factors slightly outweighed the mitigating factors.[43] The court also found no compelling reason

---

[43] We note that at one point during his oral ruling, the trial judge apparently misspoke, stating "[t]he [c]ourt's finding is that the mitigating factors only slightly outweigh the aggravating factors." The judge had earlier explained, "[t]herefore at this time, in weighing the aggravating and mitigating factors on a qualitative as well as quantitative basis, the Court is clearly convinced that the aggravating factors slightly outweigh the mitigating factors." The Judgment of

to justify a downgrade.  Accordingly, the court denied defendant's request to sentence him one degree lower.

N.J.S.A. 2C:44-1(f)(2) provides in pertinent part:

> In cases of convictions for crimes of the first or second degree where the court is clearly convinced that the mitigating factors substantially outweigh the aggravating factors and where the interest of justice demands, the court may sentence the defendant to a term appropriate to a crime of one degree lower than that of the crime for which defendant was convicted.

The downgrade feature codified in N.J.S.A. 2C:44-1(f)(2) has been extensively construed and interpreted by case law.  When a trial court considers imposing a sentence one degree lower than the crime for which a defendant has been convicted, it must apply a two-step analytical process.  State v. Rice, 425 N.J. Super. 375, 384 (App. Div. 2012).  First, "[t]he judge must be clearly convinced that the mitigating factors substantially outweigh the aggravating ones."  State v. L.V., 410 N.J. Super. 90, 109 (App. Div. 2009) (citing State v. Megargel, 143 N.J. 484, 496 (1996)).  Second, the defendant must present compelling reasons why "the interest of justice demands a downgraded

---

Conviction states: "Therefore, at this time, in weighing those aggravating and mitigating factors on a qualitative as well as quantitative basis, the [c]ourt is clearly convinced that the aggravating factors slightly outweigh the mitigating factors."

sentence." Ibid. As the Supreme Court emphasized in Megargel, "the standard governing downgrading is high." 143 N.J. at 500.

To aid in the analytical process, the Court in Megargel identified several factors for the sentencing court to consider, including: (1) "the degree of the crime [which] is the focus of the sentence;" (2) whether "[t]he surrounding circumstances of an offense may make it very similar to a lower degree offense;" (3) and "facts personal to the defendant," including his or her "role in the incident." Id. at 500–01.

Importantly, the Court made clear that the reasons justifying a downgrade must not only be "compelling," but must be based on circumstances "in addition to, and separate from, the 'mitigating factors that substantially outweigh the aggravating factors.'" Id. at 505. The Court also stressed that "the trial court must focus primarily on the gravity of the crime." Ibid. "Furthermore, in those cases in which the Legislature has acted to provide an enhanced penalty for conviction of a particular offense, the downgrade of that offense requires more compelling reasons than the downgrade of an offense for which the Legislature has not attached an enhanced penalty." Id. at 502.

We note that by prescribing a ten-to-thirty-year ordinary range of sentences for a conviction for aggravated manslaughter, N.J.S.A. 2C:11-4(c), the Legislature provided for an enhanced penalty by prescribing a range that is

A-5586-18

greater than the ten-to-twenty-year range that generally applies to first-degree crimes as set forth in N.J.S.A. 2C:43-6(a)(1). In Megargel—a case involving kidnapping—the Court commented that this principle applies to aggravated manslaughter convictions. The Court noted:

> [b]y its description of the sentence, the Legislature has indicated that an enhanced sentence was contemplated for this crime [of kidnapping]. State v. Maguire, 84 N.J. 508, 514 (1980)[;] [State v.] Mirakaj, []268 N.J. Super. [48,] 50–51 [(App. Div. 1993)] ("The Legislature has established a thirty year maximum and a twenty year presumptive term for aggravated manslaughter . . . which reflects a legislative judgement that this is an especially serious first degree offense"). Under such circumstances, trial courts must exercise extreme caution [in applying a sentence downgrade under N.J.S.A. 2C:44-1(f)(2)].
>
> [Id. at 502].

Applying these foundational principles to the matter before us, the record shows that the sentencing judge thoughtfully considered the relevant factors and acted within his discretion in concluding that the mitigating factors did not substantially outweigh the aggravating factors as required by N.J.S.A. 2C:44-1(f)(2). The court also found that defendant failed to establish compelling reasons for a downgrade, especially accounting for the enhanced punishment prescribed for persons convicted of aggravated manslaughter. Accordingly, the sentencing court properly found that defendant failed to establish either of the two prongs for a sentence downgrade as required in Rice. See also State v. Read,

397 N.J. Super. 598, 613–14 (App. Div. 2008) (holding sentence downgrade was not appropriate where the mitigating factors did not substantially preponderate, the interests of justice would not be served, and the crime was serious in nature). We conclude the sentencing court's decision not to invoke the sentence downgrade feature was based on well-supported findings of fact, and correctly applied the governing principles of law.

Nor does the sentence imposed on defendant's aggravated manslaughter conviction shock the judicial conscience. See Roth, 95 N.J. at 364–65. The judge sentenced defendant on that count to eighteen years of imprisonment, subject to NERA. As we have noted, the ordinary term of imprisonment for aggravated manslaughter ranges between ten and thirty years. N.J.S.A. 2C:11-4(c). Accordingly, the court imposed a term of imprisonment below the mid-point of the authorized range. We are satisfied that defendant was not entitled to be sentenced as if he had been convicted of a second-degree crime, in which event the maximum term of imprisonment would have been ten years.

To the extent we have not specifically addressed them, any other arguments raised by defendant lack sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(2).

Affirmed in part and remanded in part for further proceedings consistent with sections VIII and X(A) of this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION